UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA                    :
                                            :
                                            :
        -against-                           :
                                            :        S3 11 CR 0300 (JSR)
                                            :
CARL KRUGER,                                :
                                            :
                                            :
                         Defendant.  :
------------------------------------------------------------x


**DEFENDANT CARL KRUGER'S MEMORANDUM IN AID OF SENTENCING**


**Benjamin Brafman, Esq.**
**Joshua D. Kirshner, Esq.**
Brafman & Associates, P.C.
*Attorneys for Carl Kruger*
767 Third Avenue, 26th Floor
New York, New York 10017
Tel (212) 750-7800
Fax (212) 750-3906
E-mail:  bbrafman@braflaw.com
                jkirshner@braflaw.com

## TABLE OF CONTENTS

I.   INTRODUCTION.................................................................................1

II.  BRIEF PROCEDURAL HISTORY...............................................................3

III. PERSONAL BACKGROUND..................................................................4
    A. The History and Personal Characteristics of Carl Kruger's Life...............4
        1. Carl Kruger's Birth Into Fatherless Poverty..............................5
        2. Carl  Early Exposure To The Importance Of Good Hospitals In A Community ...................................................................7
        3. Carl Helps His Sister With Her Alcohol And Drug Addiction..........7
        4. Carl's Early Foray Into Local Politics, And The Beginning Of His Lifelong Support Of The "Little Guys"......................................9
        5. Carl Meets The Turanos, Adopts The Family And Assists Michael And Gerard With Medical School Graduation And The Development Of Their Medical Practice ...............................................12
        6. Dottie And Carl Continue Their Tireless Community Service.......19

IV. CARL KRUGER AS SEEN THROUGH THE EYES OF OTHERS.................20
    A. Carl Kruger, A "Man Who Just Wants To Help," Has Devoted A Lifetime To Public Service And To Caring For Others ....................................22
        1. Serving The Needs Of The Young And The Elderly...................30
        2. Serving The Needs Of A Diverse Constituency.........................35
        3. Serving The Medical Needs Of The Community.......................37
        4. Support Of The Vulnerable And The Downtrodden, The "Little Guys"....................................................................39
    B. Carl Has Become An Essential Figure In His Beloved Community, And His Retirement From Public Service Will Be A Severe Loss To His Constituency ............................................................42
    C. Carl Kruger Is Deeply Remorseful, Humbled, And Humiliated Beyond Words ...................................................................44

V. CARL KRUGER'S GUIDELINES RANGE, PLEA AGREEMENT AND PRE-SENTENCE REPORT.......................................................................46
    A. The Sentencing Guidelines As Applied In This Case And As Incorporated Into The Plea Agreement ...............................................46
    B. The Plea Agreement.....................................................46
    C. Carl Kruger's Pre-Sentence Report..........................................47
        1. The Origin Of Olympic Strategic Development.........................47

    2. Carl Kruger Did Not Personally Benefit From The Monies Received By Olympic Strategic Development.........................................50

    3. The Official Acts...................................................................52

**VI. THE LAW PERMITS A BELOW GUIDELINE SENTENCE**...........................53

    A. The Court's Discretion To Depart From The Guidelines......................53

    B. A Below Guidelines Sentence Is Appropriate In This Case...................55

    C. Carl Kruger Is Filled With Remorse; He Has Accepted Responsibility For His Conduct And There Can Be No Concern About Recidivist Behavior ...........................................................................................57

    D. The Good That Carl Kruger Has Done Throughout His Life Far Outweighs The Damage Caused By His Regrettable Criminal Conduct.................58

    E. Carl Has Already Gravely Suffered ..............................................62

    F. Sentence Parity.......................................................................63

    G. The Court Should Impose A Sentence It Deems Sufficient, But Not Greater Than Necessary To Achieve The Goals Of Sentence; A Below-Guidelines Sentence Is An Appropriate Sentence In This Case As To This Man.........................................................................................67

        1. The Goals Of Punishment As Set Forth In Section 3553(A) Do Not Require A Guidelines Sentence In This Case............................68

        2. A Guidelines Sentence In This Case As To This Man Is Not Necessary To Promote Respect For The Law..........................68

        3. Just Punishment Does Not Require That Mr. Kruger Be Incarcerated For An Extensive Period Of Time...........................69

        4. Lengthy Incarceration Would Be A Punishment Greater Than Necessary To Achieve The Goals Of Punishment, Rehabilitation, Deterrence And Protection Of The Public...............................70

**VII.    CONCLUSION**.....................................................................72

# TABLE OF AUTHORITIES

**Cases**

*Gall v. United States*, 128 S.Ct. 586 (2007)……………………………………………*passim*

*Kimbrough v. United States*, 128 S.Ct. 558 (2007)……………………………………*passim*

*Koon v. United States*, 116 S.Ct. 2035 (1996)………………………………………….59

*Nelson v. United States*, 129 S.Ct. 890 (2009)………………………………………….53

*Rita v. United States,* 127 S.Ct. 2456 (2007)…………………………………………*passim*

*Spears v. United States*, 129 S.Ct. 840 (2009)………………………………...…………55

*United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006)……………………*passim*

*United States v. Booker*, 543 U.S. 220 (2005)…………………………………………*passim*

*United States v. Canova*, 412 F.3d 331 (2d Cir. 2005)………………………………….59

*United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005)………………………………….61

*United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007)………………………………….50

*United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008)…………………….58, 62

*United States v. Gonzalez*, No. 06-CR-726 (WHP), 2010 WL 1640186

    (S.D.N.Y. 2010)………………………………………………………….66

*United States v. Gonzalez*, 647 F.3d 41 (2d Cir. 2011)………………………………….66

*United States v. Howe*, 543 F.3d 128 (3d Cir. 2008)……………………………………58

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008)……………………………….4, 55

*United States v. Jones*, 158 F.3d 492 (10th Cir. 1998)………………………………….61

*United States v. Samaras*, 390 F.Supp.2d 805 (E.D.Wis. 2005)……………………….62

*United States v. Seminerio*, 680 F. Supp.2d 523 (S.D.N.Y. 2010)……………….64, 65

*United States v. Serafini*, 233 F.3d 758 (3d Cir. 2000)……………………..…58, 60, 61

*United States v. Soumano*, 318 F.3d 135 (2d Cir. 2003)……………………………….52

*United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008)……………………………58, 59

*United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009)……………………………59, 60, 61

*United States v. Wills*,476 F.3d 103 (2007)………………………………………...…64

*United States v. Woods*, 159 F.3d 1132 (8th Cir. 1998)……………………………….61

**Statutes**

18 U.S.C. § 3553(a)…………………………………………………………………*passim*

18 U.S.C. § 3661…………………………………………………………………....…56

U.S.S.G. § 1B1.4..................................................................................................56
U.S.S.G. § 2C1.1.................................................................................................46
U.S.S.G. § 3E1.1.................................................................................................46

**Other Authorities**

Kavilanz, Parija B., Rx for money woes: Doctors quit medicine (2009), available at
http://money.cnn.com/2009/09/14/news/economy/health_care_doctors_quitting/index.ht
m.................... ...........................................................................................48

## I.    INTRODUCTION

Carl Kruger, by and through his undersigned counsel, respectfully submits this Memorandum, together with over 80 heartfelt letters[1] of support in which family members, former constituents, community leaders, religious leaders, and lifelong and new friends beg for this Court's mercy in imposing a very lenient sentence in this case, a sentence well below the advisory Guideline range.

Carl Kruger's punishment for his criminal conduct is severe and his public humiliation has been brutal.  Following his very public plea, Mr. Kruger resigned from his career as a highly-regarded and oft-decorated public official who tirelessly served the people of New York State and, in particular, South Brooklyn, for twenty-eight years – ten years as chairman of Community Board 18 and nearly eighteen years as a New York State Senator.  Mr. Kruger has been publicly disgraced, vilified, and humiliated. Many of his friends have abandoned him and former colleagues have shunned him. Now, Mr. Kruger must confront also losing the only things more dear to him than his career, reputation, and friends: his freedom, and his selfless roles as caretaker to his sister, Marlene, and as constructive patriarch to Dorothy ("Dottie"), Michael, and Gerard Turano.

Carl Kruger understands that he has committed serious crimes.  However, in this case, we submit that Mr. Kruger's conduct -- however serious -- does not equate with the severe prison term contemplated by the United States Sentencing Guidelines. Rather, we submit -- with great respect for the integrity and independence of this Court -

---

[1] Mr. Kruger's own letter to the Court is attached hereto as Exhibit A, and will be filed electronically.  However, the letters written in support of Mr. Kruger will be filed under separate cover to the Court and the Government.

that a sentence well below the Guidelines range is appropriate taking into account the extraordinary amount of good Carl Kruger has done as a senator, as a community member, and as a family man.   We further submit that Mr. Kruger's application for a below-Guidelines sentence is not an appeal to sympathy, but rather to reason and understanding.   We respectfully request a sentence that balances the crimes he regrettably committed with the enormous good he has done for others.

Carl Kruger is well aware that he betrayed the trust placed in him by his constituents, his close friends, his colleagues, and most of all, his family.  Yet it is these very same individuals who nevertheless beg for this Court's mercy when sentencing Mr. Kruger.  As so many of the letters make clear, Mr. Kruger's absence from the lives of his family and his loyal former constituents, each of whom has relied upon his dedicated service for so long, will only add to the damage that flows directly from his criminal conduct.  We respectfully seek a sentence well below the Guidelines, a sentence that fulfills the directive that a sentencing court impose a sentence that is reasonable, but not greater than necessary, to achieve the purposes of sentencing as set forth in 18 U.S.C. § 3553(a).

The conduct for which Mr. Kruger is being sentenced stands in stark contrast to his otherwise demonstrable devotion to public service, which he carried out with no regard whatsoever for his own personal wealth and status.  Mr. Kruger's twenty-eight year heralded career is now destroyed as a result of losing his moral compass; however, his professionalism, devotion, and generosity cannot be erased, nor can it be ignored.  A review of the dozens of important awards, plaques, newspaper clippings and

community newsletters provides only a glimpse of the enormous good Mr. Kruger has done in his career.[2]

Carl Kruger was for many years a valuable member of society.  At 63 years old, Mr. Kruger now begs for the opportunity to have meaningful life beyond his incarceration.  He hopes to rejoin his community in the near future and attempt to earn back the trust he has lost.  He also wants to repay the Turanos for the shame he has brought to them and for playing an instrumental part in corrupting Michael Turano and for the destruction of his medical career.

Carl Kruger now stands before the Court remorseful, chastened, and begging for mercy.  He has admitted his guilt to his family, his community, his colleagues, and this Court.  It is a certainty that he will not re-offend, as it is also a certainty that he will never regain that which he has already lost, regardless of the sentence that is imposed.

For the reasons set forth below, we respectfully submit that the Court's exercise of leniency is appropriate in this unique case.


## II.   BRIEF PROCEDURAL HISTORY

On March 10, 2011, Carl Kruger and his co-defendants were arrested.  In April 2011, Carl Kruger was arraigned on a Superseding Indictment before your Honor and a firm trial date of January 17, 2012 was set.

On December 20, 2011, Carl Kruger and Michael Turano both pled guilty before your Honor.  Following his well-publicized and humiliating breakdown in Court, and the ceaseless vilification of Carl Kruger and the Turanos in the press, their personal

---

[2] In addition to the exhibits specifically referenced in this memorandum, we will submit four binders of additional material which document Carl Kruger's long and distinguished career.

acceptance of responsibility in effect ended the case as the remaining defendants soon followed suit and also pled guilty.[3]

## III.   PERSONAL BACKGROUND

### A.  The History and Personal Characteristics of Carl Kruger's Life

As the Second Circuit recently determined, "in every case, the district court 'must make an individualized assessment' of the appropriate sentence 'based on the facts presented' and the factors detailed in § 3553(a)." *United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008) (emphasis added and internal citations omitted). In making an individualized assessment, the Court is tasked with seeing each defendant in his or her unique human complexity and, in light of the defendant's particular life story, determining the appropriate sentence for the crime the defendant has committed. As this Sentencing Memorandum and the letters submitted in support of Carl Kruger demonstrate, his criminal conduct was but the smallest part in the life of one who was a devoted public servant, a lifelong caretaker for his sister, an adoptive parent to two men -- who, in turn, served their communities as medical doctors -- and a dear friend to their mother, another tireless public servant who is today a frail woman facing the prospect of her son and partner going to prison and the ostracism of her community.

---

[3] Although Mr. Kruger's plea agreement did not contain a further reduction for a global disposition, nor is counsel requesting such relief now, it is evident that Carl Kruger's plea was a necessary precursor to the remaining defendants' speedy resolution of their respective cases. As a result, this Court and the Government saved the substantial resources that a trial of this case would have involved. We ask that your Honor consider this fact when assessing the full import of Mr. Kruger's acceptance of responsibility and the effect it had on the other defendants who soon thereafter pled guilty.

In order to meaningfully assess a complex individual such as Carl Kruger, his personal background must be explored in some detail.  Once absorbed, we submit your Honor will see that, while Carl Kruger was aware at the time he committed these regrettable acts that what he was doing was wrong and against the law, there was never a distinct moment in time where Carl Kruger decided to sacrifice all that he had worked for and cared about.  In other words, Carl Kruger is not refuting that he had the requisite intent for his criminal acts; however, the genesis of this intent is shrouded in what was an otherwise legitimate attempt to assist Michael and Gerard Turano in a new business venture.

### 1. Carl Kruger's Birth Into Fatherless Poverty

Carl Kruger's mother, Irene, was born to an impoverished immigrant family in Brownsville, Brooklyn.  At a young age, she met and married George Kruger.  The Krugers were unable to have children together and adopted Carl's older sister, Marlene. George was a violent alcoholic who died at the age of 44.  Irene, who was raising Marlene as a single mother, then met, but did not marry, Abe Tack, and Irene became pregnant with Carl Kruger Tack[4] who was born on December 3, 1949.  As a pregnant, unwed, single mother on home relief, Irene quickly arranged to sell her baby to Dr. Milton Liptiz, who in turn sold one-week-old Carl to a lawyer and his family in Long Island.  The lawyer and his family, uneasy with the circumstances of Carl's birth, soon returned the baby to Dr. Liptiz in the same brown cardboard box and blanket he arrived in.  Carl was then raised by his biological mother, who raised Carl and his adopted sister, Marlene, as a single mother.

---

[4] Carl legally changed his name to Kruger in 1983 in the State of Connecticut (*See* Change of Name Decree, attached hereto as Exhibit B).

Abe Tack was Carl's father in name only, doing little as a father beyond eventually claiming paternity of Carl.  Ultimately, a bench warrant was issued against Mr. Tack for refusing to pay $15 a week in court-ordered child support (despite assets of $3 million from managing his mother's extensive real estate holdings).  Only then did Abe's brothers begin paying the obligatory $15 per week.

In 1957, Carl's sister, Marlene, finished school, began work at a production manufacturing plant, married, and moved into a home one block away from Carl and their mother.  Money was especially tight during this time as Welfare, according to practice, ceased their payments as soon as Marlene married and began receiving a paycheck of $38 per week, of which every cent went back into the household.

Carl received religious education at Talmud Torah in Brooklyn and graduated from Tilden High School.  He then attended night school at Brooklyn College; during the the day, he worked at Marine Midland Bank's computer department for $72 a week.  One night, as Carl returned from Brooklyn College, Irene watched from a window as two men followed Carl and threw him from the second floor to the first floor stairs of their apartment building.  Later that night, the same men stabbed and killed an elderly man around the corner.  Recognizing that the neighborhood where they lived was becoming increasingly dangerous, Marlene and Irene pooled together their savings and gifts from Marlene's wedding to buy a small house in Canarsie where Carl, his sister, and his brother-in-law still live to this day.[5]

---

[5] Although much has been said and written about the Turano residence on Bassett Avenue, since 1967, Carl Kruger has always lived in the same room at his ████ Avenue L address, at the home he shares with his sister, Marlene, and her husband.

### 2. Carl's Early Exposure To The Importance Of Good Hospitals In A Community

Carl shared a very close relationship with his mother, who suffered from chronic diabetes and high blood pressure.  Carl returned home one day to find his mother at home beside a pool of her own blood as a result of severe internal bleeding.  Using several chairs, switched in succession, Carl painstakingly transported his mother downstairs to their car and drove her to Kings Highway Hospital (now Beth Israel Kings Highway).   When doctors at Kings Highway Hospital quickly determined that the hospital was not equipped to treat her, Carl drove his mother through a snow storm to NYU Hospital, where she was admitted into intensive care, given 64 units of blood, and diagnosed with cirrhosis and kidney failure.  Irene Kruger was on the brink of death, but Carl Kruger would never forget the hospital's extraordinary efforts at saving his mother, keeping her alive long enough for Carl to have meaningful time with her to say their goodbyes.  Throughout their mother's hospitalization, Carl's sister, Marlene, struggled with alcoholism and left Carl alone to care for their dying mother.  Carl Kruger, alone, oversaw her treatment for 92 straight days, never leaving her side.  Irene Kruger died in May 1978.

### 3. Carl Helps His Sister With Her Alcohol And Drug Addiction

In 1978, at the time of his mother's death, Carl was 27 years old, unmarried, with no money, little education, and living with his brother-in-law and his sister, Marlene, who was suffering from addiction.  In the years leading up to their mother's death, Marlene's alcoholism morphed into prescription pill abuse.  Her husband offered little help, so she turned to Carl.  Today, Marlene remembers, "I was on the brink of losing my battle with addictions….I begged the people around me for help.  It was Carl, and only Carl, who

7

listened to my pleas…who took action." (Letter of M. Berger at 1).   Carl enrolled his sister for inpatient treatment at Smither's Alcohol and Substance Abuse program at Roosevelt Hospital, where she suffered up to thirty-seven seizures a day and developed "wet brain," a disorder that generally leads to early dementia.   Marlene remembers her brother's support during one of the most difficult periods of her life:

> He stayed with me every single day.  He brought me food and clean clothes.  Most of all he brought me support – the kind of support that stays by your side no matter what.  I was angry and in pain, and I took my frustrations out on Carl.  I called him my jailer and tormenter.  Still he stayed.

*Id.*

Later, when Marlene was released from inpatient treatment, Carl accompanied her to her nightly Alcoholics Anonymous meetings, to which they were soon also accompanied by what was quickly becoming a new, growing and extended family: Dottie, Michael, and Gerard Turano.   Indeed, Dottie became Marlene's "friend, confidante, and surrogate mother," who began to drive Marlene each day to her volunteer job at the Community Board, a job Carl had secured for Marlene so that she would be looked after during the day.   *Id.*

Although Marlene, with Carl's assistance, has maintained her sobriety to this day, she still needs daily monitoring and supervision.   Marlene explains, "Carl has been my salvation.   It's hard to put a younger brother in that position, but because of my own actions I was forced to do that.   To this day, we still live together in the same house that we all brought 40-odd years ago."   *Id.*   Carl's ability to be by Marlene's side on a near-daily basis is what has prevented Marlene from succumbing to her addictions all these

years.  Now, as Marlene prepares for Carl's potential absence from her life, the vicious

cycle of dependency is already beginning.   Marlene continues:

> Today, the stress of Carl's plea and sentencing is pushing
> me in a direction that I fear.   I have quit my job and am
> staying home.  The back and shoulder "pain" of the 1970's
> has once again reared its ugly head.   I am seeing a
> physician for pain management – receiving injections, taking
> pills and muscle relaxants.  All of the things that had once
> caused my life to spiral out of control.  Carl is urging me
> once again start attending AA meetings and has offered to
> go with me.    I have been reluctant to take his advice.
> Without him by my side I am powerless over my demons.

Id.

### 4. Carl's Early Foray Into Local Politics, And The Beginning Of His Lifelong Support Of The "Little Guys"

In 1967, Carl's neighborhood was being developed by builders who left the

community without streets, sidewalks, or infrastructure to support the new

neighborhood.  When the land across the street from his home became slated to be

developed into a huge shopping center, Carl and several neighbors formed the

Georgetown Civic Association to address the emerging community issues that needed

their attention.  At the time, Carl knew little about community organizing, but he believed

that anything was possible with enough effort -- a belief he maintained throughout his

career as a public servant.  The Georgetown Civic Association won some early battles,

including getting the new streets paved and sidewalks installed; however, in Carl's view,

they lost the important battle to the "big guys" as the Georgetown Shopping Center rose

like a behemoth across the street from his home.  In these early struggles, however, Carl's lifelong dedication to helping the "little guys" was born.[6]

Carl's fight against the "big guys" on behalf of his community became Carl's life now that his mother was gone and Marlene was for a time stabilized.  Carl became increasingly active in his neighborhood, attending meetings of Community Board 18, the Joint Council for Community Betterment, Canarsie AWARE, the newly-forming Flatlands Volunteer Ambulance Corps, and various neighboring civic associations,.  Then, in the fall of 1974, Herb Berman, who had just gained seniority in the City Council, offered Carl the position of Chief of Staff.  The position paid $12,000 a year -- $3,000 *less* than he was making at the bank at the time-- but Carl Kruger knew he had found his calling and accepted his first paid position in what was to become a life of public service.

Herb Berman recalls meeting Carl as a young man:

> I first met Carl in the early 1970's, when, as a young man, he became one of the leaders of a civic association in my community called the Georgetown Civic Association, located in the southeast corner of Brooklyn. . . . Those of us who worked with Carl could not help but understand that he was a brilliant young man who devoted just about all of his available time to numerous community efforts.

(Letter of H. Berman at 1).

Carl's job and his spirited community involvement became more than a full-time job; it became his life.  Paula Whitney, who has known Carl since his early days at Community Board 18, recalls:

> Carl always made us proud.  He made sure a billiard parlor that was giving us problems was closely monitored.  When there was a rash of graffiti on buildings he brought in a

---

[6] Carl's Senate newsletters and other newspaper clippings documenting Carl's work over the years on behalf of small businesses are attached hereto as Exhibit C).

> steam cleaner, gave it to the community board and helped
> get volunteers for neighborhood clean-ups.  He helped get
> our parks rehabbed, and our senior citizen centers were
> hugely popular thanks to the funding he got them.

(Letter of P. Whitney at 1-2).  *See also* Letter of M. Berger at 1 ("I saw him grow and

achieve, all on his own, through his own dedication, hard work, caring for other people

and caring on a larger scale for the world we live in.").

While working at the community level was exciting to Carl, the prospect of

working on state issues soon became his next goal which he was able to achieve when

Stanley Fink, then slated to become Assembly Majority Leader, invited Carl to join his

staff.  Despite his new, paid position, Carl remained active in his cherished volunteer

activities and was soon elected Chair of Community Board 18, where he served for ten

years in an unpaid position that allowed him to work on many community issues that

required access to government agencies.

In short, Carl became a superlative community activist wholly devoted to the

needs of his community.  His talent at organizing and directing campaigns became

widely and highly-regarded.  His campaign themes never strayed from his truest belief,

that the survival of the "little guy" -- the mom-and-pop hardware store versus Home

Depot, a local linen store versus Bed, Bath & Beyond -- was paramount.

As chair of Community Board 18, Carl worked closely with then-District Manager

Frank Seddio, a retired New York City police officer.   Frank remembers:

> In Canarsie, going back to the 1970s, Carl and I worked with
> the storeowners on Avenue L to maintain the vitality of the
> mom-and-pop commercial strip and to keep residents
> shopping in their own neighborhood rather than going
> elsewhere.  We knew this would keep the local economy
> secure and foster a sense of community pride.

(Letter of F. Seddio at 1).

Mr. Seddio writes of Carl's tenacity:

> I could go on indefinitely about the issues we addressed, the
> wars we fought, the victories we celebrated and the people
> we mobilized to fight our battles with us.  I won't do that, but
> what I will say is that without Carl Kruger's strong presence
> in all of these issues, without his voice, energy, creativity and
> never-say-die attitude, without Carl leading the charge,
> history wouldn't be written in quite the same way.   He's
> always been the much needed thorn in the side of
> bureaucracy.  We need more thorns like him.

*Id.* at 3.

Frank had always been supportive of Carl, and when he learned of Marlene's

bout with alcoholism, he suggested that Marlene also volunteer at the Community

Board, where she might develop a sense of self-worth and also be looked after while

Carl was at work elsewhere.   The arrangement worked well, as Marlene began to

function at a much higher level now that she had a place that needed her as much as

she needed the Community Board.

> When Carl needed a place for Marlene after she recovered
> from her substance abuse problem, we welcomed her at the
> community board office and all of us, me, Dottie, and of
> course Carl, watched over her together.

*Id.* at 2.

### 5. Carl Meets The Turanos, Adopts The Family And Assists Michael And Gerard With Medical School Graduation And The Development Of Their Medical Practice

It was through his work at the Community Board that Carl met Dorothy "Dottie"

Turano.  At the time, Dottie was deeply involved in every aspect of the local schools,

having served as president of the parents association of P.S. 114, P.S. 168, and South

Shore High School; secretary and treasurer of the Community School Board; and executive vice president of the Concerned Parents' Association of Canarsie.   At Community Board 18, Dottie became a surrogate mother to Marlene, picking her up each morning and driving her back home at night.   Dottie became more than a co-worker; she forged strong, close friendships with Carl and Marlene, and they soon became to each other the family they all needed so very much.

Meanwhile, Dottie was raising two teenage sons, Michael and Gerard, amidst a rapidly deteriorating marriage. Dottie's sole aspiration was to send her sons to medical school, which offered the promise of respect, prestige, and a secure future.   This philosophy was shared by Carl, whose unwavering respect for medical personnel at all levels was cemented when he saw the devotion of the doctors and nurses who struggled to keep his mother alive for so many grueling months.   Dottie's older son, Michael -- a bright student with outstanding potential -- began to consider college and medical school options.   Her younger son, Gerard, was younger by two years.   Dottie knew of a new program at CUNY, the Sophie Davis School of Bio-Medical Education, which allowed students to complete their four years of college and four years of medical school in seven years with a guaranteed seat at one of eight medical schools.   Michael, like his mother, was also active in school and in the community, having served as president of his senior class and a volunteer at Coney Island Hospital.

Carl was happy and eager to utilize the organization skills he developed over the course of his work on campaigns to help Michael assemble all of his well-deserved letters of recommendation required to apply to the CUNY program, to which Michael was quickly accepted.   For Dottie, a dream had come true.   Her son was to be a doctor.

13

She squirreled away every penny she could in the hope of getting Michael and Gerard through school with little or no student loans.  Michael proved to be a model student committed to the philosophy of the CUNY medical program: to provide primary care services to the at-risk population in the five boroughs.

At about this same time, Dottie confided to Carl that she and her sons were the victims of an abusive husband and father.  Carl took it upon himself to stand by Dottie's side during what became, up to that point, the most difficult period of her life. The bond that was forged between Carl, Dottie, and her boys was strengthened by the ordeal of a nasty divorce which the family survived, due in large part to Carl's unwavering strength and courage.

With no real family of his own, Carl became a surrogate member of the Turano family.  Dottie reflects, "As I unraveled…he picked us all back up.  He had a troubled household himself and I think he understood our pain."  (Letter of D. Turano at 4).

As Dottie writes, Carl "was a natural source of strength" who "could take charge of any situation, analyze the options, and suggest to you the best one."  (Letter of D. Turano at 4).  For example, when Michael needed a $200 stethoscope at City College, Carl purchased one for not only Michael but also for Gerard. When Michael was staying at the 96th Street dorms, Carl helped him renovate his dorm room and brought him food each week.  Eventually, both brothers' close relationship to Carl became cemented through the boundless ways in which he offered support in their lives, for example by driving them to school, providing food, and, most importantly, by being a father-figure when they most needed it.

Dottie endured a messy divorce, from which she emerged with only the house she lived in.  During this time, in an attempt at vicious retribution, Dottie's ex-husband even emptied Michael's tuition account of the money that Dottie had worked so tirelessly to save for their sons' education.  Carl and Dottie, together, somehow managed to pay Michael's first year of tuition and the Turano boys, along with Dottie and Carl, their new surrogate father, forged ahead.

While Michael was still enrolled in the Bio-Med program, Gerard applied to join his brother at school, but was waitlisted despite outstanding grades and letters of recommendation.  Gerard was eventually accepted into the same program, and he and Michael were well on their way to becoming doctors.  The two shared the same classes and operated on virtually the same schedule, traveling together and studying together. The Turano family was further galvanized around their relationship as well as the new relationships between Carl and his new family.

The proudest day for Dottie Turano was in June 1986, when Michael graduated from Mt. Sinai Medical School.   Together with Carl, they all celebrated Michael's success as a family.

Michael applied to nearby residency programs so he could be home with Dottie and Gerard.  Michael's scores were exemplary, and Carl again helped him with his applications. Michael was matched with a preliminary surgery program at Brookdale Hospital, which was within walking distance from the Turano home.  Brookdale was a major trauma center as well as the community's urgent care center serving an at-risk population. Under the leadership of Dr. Gerald Shaftan, Michael excelled in the surgery program and was applauded not only for his knowledge, but also for his surgical skills.

15

Later, Gerard, too, would apply for a residency match at SUNY Downstate, even while he was personally struggling with symptoms of adult ADD, a disorder which would not be diagnosed until many years later.  Gerard recalls Carl's support during this especially difficult time:

> Carl gave me daily study milestones that I had to reach. Mom and Carl made a chart for the refrigerator.  Every day Carl would check the chart and I had to mark off pages as I did them.   Carl spent two solid weeks reviewing with me before the test.  The day of the test, he went with me and sat in the car.  A few weeks later, I found out I passed.

(Letter of G. Turano at 3).

While Michael was completing the two-year preliminary surgical program at Brookdale, Gerard was starting his first year at Downstate. Michael then made a career change.  He felt that his real value would be in the world of obstetrics and gynecology. Michael found the challenges of delivering babies, performing gynecological surgery, and interacting with patients to be more rewarding than general surgery, and he thrived in the grueling seven-day, 24 hour-a-day program.  Not a day went by that Michael did not share his enthusiasm with Carl, who had helped him so much along the way.  True to form, Gerard, too, was drawn to Ob/Gyn and ended up in the same Ob/Gyn program as Michael.  The Turanos were delivering babies together and, as always, making their family, including Carl, proud.

In the last months of his residency, Michael became ready to take the boards and move out into the world of medicine.  His fellow students were being accepted into practices in hospitals all across the country, but Michael was confused and, once again, turned to Carl for guidance.

Carl turned to his most refined skill once more: getting something started from scratch. He assisted Michael in creating a package consisting of Michael's resume and a cover letter seeking a position that served the people of New York City in a hands-on manner. This package was sent to the chairperson of every Ob/Gyn department in every hospital in the five boroughs. As a result of this campaign, Michael received responses from Bronx Lebanon Hospital and New York Downtown. Dr. Stanley Zinberg, chair of the Ob/Gyn Department at NY Downtown, responded he was unsure whether there was an opening, but invited Michael to speak with him. At Carl's encouragement, Michael made the appointment.

Carl drove Michael to Dr. Zinberg's Office at New York Downtown and waited patiently in the car while Michael entered the meeting that would soon change his life. An hour later, Michael reported to Carl that Dr. Zinberg was winding down his practice, as he was no longer interested in continuing to do deliveries on nights and weekends and needed someone he could count on to interact with his patients and be on-call when needed. In exchange, Dr. Zinberg offered Michael a $50,000 salary and agreed to pay his malpractice insurance for the first year. He would provide Michael with a desk, let him install a phone, print his own business cards, and use Dr. Zinberg's office to develop his own private practice.

Soon, Michael began covering Dr. Zinberg's on-call hours in addition to doing his deliveries. Carl printed Michael's business cards and stationery, hired an answering service, and began doing what he does best: campaigning for Dr. Michael Turano. Carl purchased mailing lists of every identifiable female in Lower Manhattan by category – age, ethnicity, ZIP code, area – all the information one would require to develop a core

17

base of potential patients.  Carl sat with Dottie at her kitchen table, using a secondhand Tandy Radio Shack computer, and entered all 150,000 names individually.   They drafted a letter announcing that Michael had opened a new practice in Lower Manhattan providing cutting-edge care and full obstetric and gynecological services.   Carl also assisted Michael as he filled out applications to every health insurance plan whose panel was open and available.

The letters they sent materialized into the beginning of Dr. Michael Turano's private practice. But a single letter, as in any campaign, never wins the election, and so Carl followed up with a second set of letters repeating the same process, this time informing recipients that they would soon be receiving the first copy of Dr. Michael Turano's "Women's Health News"[7].   The Women's Health News was an eight-page, two-color newspaper created by Carl, Dottie and Michael.  Carl and Dottie hand-stacked the bundles, ran the mailing labels, obtained post office trays, and brought the papers to the respective post offices.   Dr. Michael Turano's first "Women's Health News" saturated Lower Manhattan.

As Michael began to build a solid patient base, he realized that he had free time remaining for other endeavors.  Carl introduced Michael to his friend, Lou Valentino, a leader for the International Longshoremen's Association ("ILA"), which was in need of an Ob/Gyn to take over on Monday mornings. Michael began filling the Monday morning shift at the ILA Medical Unit, followed by the Thursday afternoon shift at the Hotel Trades Union on West 57th Street.  Additionally, Dr. Zinberg was a contractor provider of Ob/Gyn services to the Bureau of Prisons' ("BOP") MCC and MDC.  Michael seized this

---

[7] Attached hereto as Exhibit D.

opportunity, and was given the highest security clearance by the BOP and was soon seeing patients at both facilities.  Starting with a diploma, an appetite for hard work and, of course, Carl in his corner, Michael transformed his fledgling practice into one that soon grossed over $1 million in its second year.

Meanwhile, Gerard was completing his Ob/Gyn residency, and Carl began planning his career, too.  Carl and Gerard developed a business plan which they presented to Beth Israel Hospital, and emerged with rental space at 3131 Kings Highway, the Beth Israel Professional Building where Gerard was to open his private office.  The same medical campaign process was repeated in Brooklyn and Gerard's practice soon flourished as well.

The best part of this family-oriented medical endeavor was that Michael and Gerard were soon able to cover for one another and, soon, became interchangeable parts.  The bottom of their stationery reads the phrase, "Two Doctors, One Commitment."  Michael and Gerard practiced medicine, delivered thousands of babies, properly diagnosed and treated countless women with early-stage cancer, counseled and advised, and referred and consoled.  They became caring, respected, and admired doctors by all whose lives they have touched.   Carl was proud, as any father would be, of his boys and his role in the Turano family.

### 6. Dottie and Carl Continue Their Tireless Community Service

Dottie became district manager of Community Board 18 when Carl resigned as Chairman to pursue, and win, a hard-fought special election in February 1994 to represent his community in the State Senate.  Carl's nearly 18 years in the Senate were a challenging and productive time that allowed him to continue his dedication to fighting

on behalf of the "little guy."  He opened the first district office that served as a "one-stop constituent services center."  Rather than simply listing Carl Kruger's extensive resume of accomplishments in the Senate, we have highlighted some of the more than 80 heartfelt letters submitted on his behalf which paint an accurate picture of a selfless, devoted, and tireless public servant and human being.

## IV.   CARL KRUGER AS SEEN THROUGH THE EYES OF OTHERS

The letters submitted in support of Carl Kruger describe a man of extraordinary generosity, kindness, patience, and modesty.  One example of such a letter begins with the remarkable statement, "If not for Senator Kruger, I would not be alive today." (Letter of O. Martello at 1).

Orazio Martello, who was diagnosed with bladder cancer at the age of 67, met with Carl Kruger and told him, "I want to live to see my grandchildren grow up."  *Id.*  Mr. Martello recounts Carl's extensive efforts at securing him the experimental treatment he so desperately needed, but was unable to receive without FDA approval.  "[Kruger] called the FDA on the phone.  He sent out a press release and contacted the newspapers and TV stations. . . . The Senator also began a letter writing campaign asking [other] people to write to the FDA."  Today, Mr. Martello proudly states, "I am 83 years old alive, well and cancer free. . . . Back in 1995 I never dreamed that any of this would be possible."  *Id.* at 2.  He reflects on Mr. Kruger's compassion and empathy:

> Senator Kruger didn't have to help me the way he did.  He could have written a letter just like the other politicians did and stopped when the FDA said no.  But Senator [Kruger] wasn't like the other politicians.  He saw me as a person, not just a constituent with a reference number.  He saw the pain I was in.  He saw how desperate I was.  He took on my case not as a politician but as a human being.  He helped me not

because it was part of his job but it was part of who he is.
To me, that meant the difference between life and death.

*Id.*

We discuss in greater detail below his many other specific acts of kindness and generosity -- whether on a personal level or through his status as a public official -- that Carl Kruger has engaged in consistently throughout his life and that which have earned him such deep, heartfelt respect and appreciation from others.  We submit that his generous character and the countless good deeds he has performed merit consideration as this Court determines an appropriate punishment for his criminal conduct.

Carl Kruger embraced his role as a full-time Senator, which required all of his energy, and his devotion to his community was extraordinary on issues as diverse as the makeup of his constituency.  The numerous letters of support we have provided paint the picture of a man wholly devoted to caring for others.  However, it is impossible to document and relay every single act of kindness Carl Kruger has demonstrated throughout his many years -- acts performed not only in his capacity as a public official, but also as an active, private member of the community.  We hope the sampling of letters provided here capture some sense of the good man that he is.

In order to appreciate the breadth of Carl's many acts of generosity, both in his capacity as an elected official and also as a lifelong member of the same community, it is important to understand the impetus for Carl's constant need to play a transformative role in the lives of others, and to help and to serve.  At the heart of this man is a kid who grew up in Brownsville, was abandoned by his father, and raised by a single mother on welfare.  Later, Carl fought hard to for a voice in the community leadership, and fought

harder still to pull others up by their bootstraps.  "[T]o know Carl would be to understand that he is a person who is thoughtful, kind and giving right down to the depths of his soul- a person who wants nothing in return except to bring comfort and happiness to those around him."  (Letter of Kroening family at 2).  Jason Koppel, who was mentored by Carl as a young man and later served as his Chief of Staff for 17 years, reflects:

> Many a time he would say how he never had a good life and
> that he wanted to make sure I made the best of myself.  He
> always knew how to help someone navigate their own life in
> what ultimately seemed to be the correct way.  If you were
> going through a difficult time he would take on that difficulty
> with you and you would live it together.

(Letter of J. Koppel at 2-3).

### A.  Carl Kruger, A "Man Who Just Wants To Help," Has Devoted A Lifetime To Public Service And To Caring For Others

Carl's many acts of kindness toward friends and constituents as verified in these letters leave the impression of a man who was accessible, attentive, and considerate of the needs of others.  The letters note how Carl always made himself available to his constituents.  They describe him as "the type of person who has gone out of his way for so many people", as someone who had a "knack for making every individual problem seem like the only problem on his plate."  (Letter of M. Aronson at 1).  As Ronald Bianchini remembers, "[w]hen he said, 'I'll take care of it,' he really did."  (Letter of R. Bianchini at 2).  In many ways, Carl's position as it pertained to serving the needs of his constituents was quite simple.  As one constituent described, "Besides all of the social services that he offered, he was always able to get to the bottom of a problem and then make people solve it.  He would bring attention to the problems, and he'd make government work to fix it."  (Letter of L. Zahler at 1).

What is clear from these letters is that Carl's advice and guidance was not only depended upon by those close to him, including the Turanos, but also by countless strangers as well.  In many ways, it is a reflection of Carl's dogged nature, his attention to detail, and his persistence in needing to help others.  Carl enjoyed asking questions, and his due diligence on an issue or topic was always followed by action.  In everything he did, Carl's focus was sharp, his energy abundant, and his stubbornness to see results unwavering.  His tenacity did not stop with seeing the Turano brothers through medical school.  It was, in fact, a hallmark of his character and the temperament that guided how he served his constituents, one that Dorothy D'Aleo encapsulates well: "Mr. Kruger went above and beyond - a Senator or any elected official doesn't normally 'mix into' the personal lives of his constituents, but then he wouldn't be Senator Kruger." (Letter of D. D'Aleo at 1).  Carl's longtime aide, Adrienne Knoll, writes, "You always knew how Carl felt about an issue.  He was easily the most visible among the local elected officials.  The issues we aired garnered significant media attention.  We knew that Carl's chutzpah and front-row visibility made him a target for critics.  I think he was having fun.  I know I was."  (Letter of A. Knoll at 3).

Indeed, many relied on Carl's trademark tenacity and diligence, especially during times of illness.  Richard Resner recalls how his father's anxiety prior to having a major surgery would not be alleviated until he knew Carl had arrived at the hospital.  "I can remember the day that my dad was going up for [a 14-hour operation].  Dad wouldn't let them wheel him up until Carl came to make sure everything was okay.  We all looked to Carl.  He was the go-to person."  (Letter of R. Resner at 2).  Mr. Resner writes of Carl's steadfast presence, "When my dad needed a shoulder, Carl was there.  When he

changed his medicine, Carl was there to advise- yes, to advise.  We learned to call him not Senator Kruger, but Doctor Kruger."  (Letter of R. Resner at 1).

Ronald Bianchini, Dottie Turano's brother, describes Carl's help with his mother:

> As her frailty became more apparent due to illness and age, and her needs became greater, Carl was at her side.  When she broke her hip, Carl was at the hospital and arranged for her rehab.  When she had her colon surgery, Carl was there at the hospital and arranged for her radiation.   For my mother, it was always "Where is Carl?  I need Carl.  If I want anything done right, get Carl."

(Letter of R. Bianchini at 3).  Mr. Bianchini continues:

> He became her savior.  As her strength ebbed, he absorbed it and gave it right back to her.  He provided the strength that at times we didn't have either…. [W]hen my mother passed, she didn't have one bedsore, and that was because of Carl and his attentive, hands-on caring.  He'd drive back from Albany after legislative session and go straight to her house on east 35th Street to treat her sores.  It seems unbelievable, but that's what Carl is- unbelievable.

*Id.  See also,* Letter of M. Davidson at 2 ("A day didn't go by when you wouldn't see Carl's car outside Annette's house.  He brought in food, checked on her and made sure he was provided for, even though in her last years she didn't know who anyone was or where she was herself."); and Letter of Kroening Family at 1 ("For more than twenty-five years, we have come to count on Carl as our 'rock.'  In good times and bad times, Carl has been viewed as the 'go-to' person.").

Jason Koppel writes, "Carl's need to be part of people's lives and help them through crisis is one of his most positive traits.  People always said you could have no better friend than Carl Kruger if you were in crisis.  I am proud to have worked for him." (Letter of J. Koppel at 3).  Others who worked for Carl concur.  Adrienne Knoll writes to the Court of her experience of working for Carl for the last eighteen years, the past

twelve of which she had served as his Director of Communications. She writes of a boss who, though described as a "workaholic," was an extremely understanding individual who encouraged his employees to place family first, as he did, and to take time off to care for family members for an illness or death; who took the children of his staff members for ice cream; and who never asked his staff members to intervene even when Ms. Knoll's husband published articles critical of Carl in his chain of Brooklyn newspapers. Ms. Knoll writes of her experience working for Carl, "I never missed writing a weekly update, even on vacation. I mention all this because Carl Kruger never required me to do any of it. He was kind and decent, and I wanted to do it for him. His decency inspired a deep sense of loyalty, one that cannot be severed." (Letter of A. Knoll at 2). Similarly, when Howard Pincus' son required a rarely-administered test to diagnose an illness, Carl found a doctor who would perform the procedure; and when Howard's mother was rushed to an unknown ER in Florida, Carl asked all staff members to cease work and help find Howard's mother. (Letter of H. Pincus at 1-2). *See also,* Letter of J. Koppel at 2 ("From the time I began working at the Senator's office it became crystal clear to me why he was so loved by his constituents. The close attention given to each case made the constituents feel that their issue was the most important.").

Clearly, Carl was beloved by many constituents. Jason Koppel writes, "The Talmud tells us that saving one life is like saving the entire world. Well, Senator Kruger is responsible for saving many lives." (Letter of J. Koppel at 2). It is apparent from the letters that friends and strangers alike turned to Carl for answers and solutions during their most challenging moments in life. *See* Letter of G. Mitsopoulos at 2 ("There are

plenty of people who are nice enough to take an interest in your life, but Carl Kruger never hesitates to go further. Much further. He asks questions, he gets involved, and he stays by you for support."); Letter of T. Roma at 2 ("He was not afraid to show how much he cared. He always made himself available, 24 hours a day, seven days a week. I always knew that when I approached him with an idea or a problem, he would respond quickly and effectively."); Letter of M. Gregorio at 1("[I] never experienced an elected official who worked so tirelessly for his constituents as Carl Kruger did. Seven days a week, from early morning to late-night meetings. He didn't take vacations. He offered constituent services through his district office that I never saw before— representatives from DMV to assist in preparing wills and medical documents and more than I could list."); and Letter of B. DuBose at 1 ("Carl and I were community activists before the phrase became popular and he was always there when needed....In all honesty, I can say that Carl and Dottie were two of the most dedicated community activists in our part of Brooklyn. They were out to one meeting or another almost every night, and they even spent their weekends assisting groups and people.").

Carl's constituents write exhaustively about the many ways Carl has assisted them in their times of need. For example, when a single mother and her daughter lost their pet dog in a pet shop accident, Carl not only personally delivered a new puppy, but also called a news conference to publicize the dangers of using pet shop drying cages, ultimately introducing legislation to ban their use. "State Senator Carl Kruger did this without hesitation for one family in his community that he didn't even know. His care and concern over my daughter's well being was so incredibly touching. He told her a story of his own dog that he loved and lost. I will never forget how much he helped my

daughter heal her broken heart...He showed her how making a difference in one person's life can change the lives of an entire community." (Letter of T. Del Toro at 2). *See also* Letter of Z. Del Toro at 1-2.

Indeed, Carl's unwavering presence was constant and especially relied upon by those without resort. Tatiana Varzar recalls that, when she lost her restaurant in a fire, "the only person who was there for me to get through it, the person who spent a whole night on a bench across my restaurant, was Carl Kruger." (Letter of T. Varzar at 2). "Carl Kruger proved every day that he was a savior and a warrior for the little people. His sincerity was absolute. He wanted only to help, to improve the lives of those he served. He wanted nothing in return, not even gratitude. But grateful we were anyway." *Id.*

When Arkadiy Shef faced deportation proceedings after his release from prison, Carl, at the request of Arkadiy's wife, Angela, personally traveled to Newark to testify on Arkadiy's behalf and to plead for leniency from the judge so that Arkadiy may remain in the U.S. with his wife and children. Now, Angela Shef pleads for Carl:

> Your Honor, today it is my turn to appeal to a judge and beg you for mercy on behalf of Carl Kruger. Please allow him to remain with his family and with the community to which he has given his heart and soul. Please allow him to make up for whatever errors in judgment he has committed and rebuild his life based on sound values, love and faith.

(Letter of A. Shef at 2-3).

Alan Butrico tells the story of how, when a neglected building collapsed and displaced a young couple, who among their lost possessions included an unbequeathed engagement ring, Carl not only implored the fire department to search through the

rubble for the jewel, but also secured the bride-to-be a job at a local diner.   (Letter of A. Butrico at 1-2).

These are but some of the scores of stories of how Carl has changed the lives of his constituents and the ways in which he went above and beyond to secure their needs.  Others have written to the Court of how Carl telephoned the Chrysler motor company daily until the company eventually admitted to selling a defective vehicle to a customer and constituent (Letter of G. Mitsopoulos at 2); how Carl ensured that one special needs child was transported safely home after school each day (Letter of H. Podolsky at 1); how Carl frequently recommended doctors and checked in on constituents hospitalized for an illness (Letters of D. D'Aleo at 1; M. Davidson at 1); and how he helped a young man find direction in his life and, later, pass an EMT program (Letters of L. Lavino at 2 and V. Lavino at 1).  What emerges from these stories is the understanding of a man who went above the duties entrusted to him as an elected official, and truly saw his role as that of a public servant in the most literal sense.

Carl did not approach his role merely as a senator who put out fires; he was a constant presence in the community as well.  One young constituent writes,

> From the time I was in Pre K to now he would always come to our school meetings and would see him at the community center.  We would run into him at the grocery store, the bagel shop and Dunkin Donuts.  He was always very nice and would stop and say hello and talk to everyone.  But it wasn't until this happened that I really understood what being a Senator was all about.  Now I finally realized that being a Senator is about helping the people around you.  That living and working and caring about a whole neighborhood is what makes a great Senator.  Senator Kruger taught me how to forgive when people sometimes do wrong.

(Letter of Z. Del Toro at 2).

Carl, as ever, was also deeply concerned with preserving the dignity of others. When one of his constituents passed away in Florida and was left unclaimed by her son, Carl personally arranged for her ashes to be returned to New York so that she could be buried next to her husband, in addition to paying for the cost of transportation himself and arranging for a tombstone. (Letters of D. Measer at 1 and E. Walansky at 2). Similarly, when a staff member at his Brooklyn district office passed away, alone, Carl ensured that he receive a proper memorial service, grave marker, and burial, which was attended not only by Carl and his staff, but also the Turano family. (Letter of M. Gregorio at 2).

Carl's assiduous attention to his constituents was not unnoticed by other State Senators, and many felt the need to meet the standard that Carl raised for his colleagues. One constituent observes, "Carl's hours extended well beyond those of his office and he freely gave out his cell number to constituents so he could make himself available. I have seen many elected officials come and go, and I can say without compromise that his community office put all others to shame in its resources, staff and availability. In fact, when he first opened his office it forced other elected officials in the area to do the same, now embarrassed by seeing what could be, rather than what it was." (Letter of B. Tracey at 1).

Michael Gregorio writes, "[I]f all elected officials worked as hard at their job as Carl Kruger did, we would all be better off." (Letter of M. Gregorio at 1). *See also* Letter of S. Barrison at 2 ("[T]he bottom line is, with Senator Carl Kruger, you knew that if you called you would get a response and if he agreed you would get action and some attention brought to your concern. That is rare in today's world of elected officials.");

and Letter of M. Schachner at 1 ("Carl Kruger is a tough act to follow. Public servants with his level of compassion, with his willingness to get involved where others step back, with his earnest desire to stay his moral ground, come along only rarely in a person's lifetime.").

Erica Sherman, who worked as an editorial assistant for a chain of newspapers in Brooklyn, drew from her decade-long experience when she noted, "Both in the newsroom and on the website, I believe that no lawmaker's name was mentioned more frequently, and accompanied by such impassioned dialogue, as that of Senator Carl Kruger." (Letter of E. Sherman at 1). "Senator Kruger not only gave thunderous voice to the voiceless, but where one lawmaker may have pranced like a gazelle around an issue, Senator Kruger, obstinate and angry, rolled up his sleeves and set upon tackling it head on." *Id.*

Tina Tel Toro, the mother of the young girl who lost her dog in a pet shop accident, offers this perspective: "Think of my daughter and the difference he made in her life. Multiply that by thousands and you have an idea of all the good that Mr. Kruger accomplished in his long career as a public servant." (Letter of T. Tel Toro at 2). Likewise, Tony Roma concludes, "Senator Kruger was very, very good at what he did - and when you're that responsive, and that caring, it's not so much a reflection of your job but of who you are as a person. Carl Kruger was, and still is, a nice guy who just wants to help." (Letter of T. Roma at 2).

### 1. Serving The Needs Of The Young And The Elderly

When examining Carl Kruger's career as a public servant over the course of multiple decades, it becomes apparent that several issues were consistent on Carl's

agenda.   For example, Carl understood that the most vulnerable members of a community are the young and the elderly.   Having served as a ranking member of the Social Services/Children and Families Committee, Carl was particularly attuned to the needs of the elderly.   He made sure they were looked after by providing them with invaluable access to preventative healthcare and distributing free services such as flu shots, eye exams, mammographies, stroke testing, and cholesterol and blood pressure checks. (Letter of L. Zahler at 1).   As Ellyn Walansky explains, "A few years ago, when there was a severe shortage of the flu vaccine throughout the entire nation, Mr. Kruger made sure that his senior citizen constituents received their shots.   Mr. Kruger refused to take no for an answer.   Every year, Mr. Kruger, working along with Beth Israel, also administered hundreds of free PSA tests and mammograms.   Every three months he sponsored a cholesterol screening in his district office.   Maintaining the health of the community was a high priority for Mr. Kruger."   (Letter of E. Walansky at 1).   *See also* Letter of R. Lieberman at 1 ("[N]o one else goes above and beyond for senior citizens the way Senator Kruger does.   Other people just send us to the Social Services office and allow us to fend for ourselves.   We get nowhere.   I have visited Senator Kruger's office for help more times than I can remember.   I call his office almost every day.   I know he offers free flu shots to keep us healthy and free health screenings to test for diabetes, high blood pressure, glaucoma and other conditions.   Senator Kruger is our friend.").

Always mindful of the ways in which he could help make their lives a little easier, Carl and his office assisted senior citizens with obtaining Medicare coverage, and applying for social service programs from food stamps to the Home Energy Assistance

31

Program (HEAP) to cover the costs of their heating bills.  *See* Letter of M. Hamowy at 1

("In the winter, when I can't pay my heating bills and Social Security doesn't cover it,

Senator Kruger helps me apply for HEAP…   Senator Kruger started this program in his

office.  He fills out all the paperwork and deals with the agencies for me….If you ever

came to Senator Kruger's office and saw the hundreds of seniors who come in for help

with HEAP, Heartshare, SCRIE, food stamps, and all the other programs he offers in his

district office, you would be amazed.").  *See also* Letters of Iris Horn, Richard Kuo and

Rabbi Shmuel Lefkowitz.

Ronald Bianchini writes,

> The senior citizens' group at Mary Queen of Heaven [a parish in Mill Basin] counted on him for his strong will and determination to do battle for their cause.  From the confusion over Medicare Part D to the problem of an unscrupulous home improvement contractor preying on the elderly, they knew that they had someone they could count on to be their voice and, in many instances, go to hearing when they could not…He kept his office open late to handle the Medicare Part D mess.  He reported the unscrupulous contractor to the city, then did a newsletter warning other seniors so they wouldn't be taken advantage of.  To our senior community, Carl Kruger was a hero and protector.

(Letter of R. Bianchini at 1-2).

Rabbi M. Burg affirms,

> When budget cuts threatened to close the Jay Center Senior Program, which provides kosher meals and social services to many senior citizens in Brooklyn, Carl not only organized a campaign to save the Jay Center, but also helped raise over $1 million for renovations to the center, including an elevator and handicapped accessibility.

(Letter of Rabbi M. Burg at 1-2).   *See also* Letters of Monsignor J. Gigantiello, L. Rozenberg, and Rabbi S. Lefkowitz.

Elizabeth Pompilio was a longtime employee in Carl Kruger's Senate Office whose primary job was to visit senior centers throughout the district and assist the senior population in whatever way necessary. Ms. Pompilio recalls the story of "Stuart" as one that" will always stand out in [her] heart." (Letter of E. Pompilio at 1). When Stuart, an older Work Experience Program employee of Carl Kruger's with mental issues was unusually late for work, the entire office "knew something was wrong." *Id.* She explains:

> Senator Kruger was very concerned. Since Stuart had no family or friends that we knew of, he felt a responsibility to take on that role. He sent one of my coworkers, Mike Gregorio, a retired NYPD detective, to Stuart's apartment to check on him. . . . Stuart was in his apartment, dead. . . . Senator Kruger started researching how we could give him a proper burial. He finally spoke with someone at the Hebrew Free Burial Society. They operate a cemetery on Staten Island and arranged for Stuart to have a memorial service and burial. One day, all of us in the district office, including Senator Kruger, traveled to Staten Island and made sure that Stuart got the dignified burial he deserved, with his friends there to say goodbye. No one else was at the service, only us. If not for Senator Kruger's interest and concern, none of this would have been possible.

However:

> Senator Kruger wasn't done with Stuart yet. He wanted to make sure Stuart had a grave marker to show respect for the life he lived. Once again, he researched how to make this happen. That's how we learned Stuart had done something that we didn't in his early years, something that came before the mental illness and hard times. Stuart had served proudly in our nation's armed forces and had received a military discharge. He was entitled to a grave marker for his service. . . . I don't think any other elected official anywhere would have done this for an employee.

*Id. See also* Letter of M. Gregorio at 1-2.

Carl Kruger has also been a friend to a community of veterans, one of whom writes, "With him, we felt like the soldiers we were and always will be – soldiers who deserve more than just medals.  He remembered what we did, and he honored us." (Letter of L. Rozenberg at 2).

Whether tackling student drug and alcohol use, shepherding after-school dismissals and activities, or introducing remedial programs to raise reading and math scores, Carl has also been a consistently vocal supporter of the causes that most resonate among the younger members of his constituency. (*See* Letter of J. Falzone at 2).   Education has always been a top priority for Carl, first as the chairman of Community Board 18 and later as State Senator.  Indeed, in 2010, the New York State School Boards Association honored Carl as the "Legislator of the Year" for his longtime work on school governance issues.  (Letter of D. Weber at 2).   *See also* Letter of J. Falzone at 1(describing efforts by Carl to update a policy change affecting intermediate schools citywide: "Senator Kruger didn't approach the problem tentatively- he tackled it with the full weight of his common sense and practicality.  He went all the way up the educational ladder to Merryl Tisch, Chancellor of the Board of Regents, and demanded an answer.  Senator Kruger was so forceful in his argument and so convinced of its correctness that Chancellor Tisch got personally involved.  Passionate would be the best way to describe Senator Kruger when he focuses on an issue."); Letter of C. Pino at 1 ("Whether it was the P.S. 312 innovative environmental center or the acquisition of additional city owned land adjacent to our school, Carl Kruger has been a champion for the Bergen Beach community and School."); and Letter of A. Knoll at 2-3 ("New York City still has 32 school district and community superintendents.  This is due not just

partly, but entirely, to Carl Kruger's tenacity, his healthy sense of indignation, his strong

identification with the underdog and his relentless desire to fight for what is morally

right."). These efforts, as Bob Tracey, writes, are "all part of the Kruger legacy." (Letter

of B. Tracey at 1).

### 2. Serving The Needs Of A Diverse Constituency

Carl represented one of the most culturally diverse neighborhoods of Brooklyn,

including Brighton Beach and Sheepshead Bay. When his district's immigrant

community grew, Carl hired bilingual staff members and distributed newsletters in

numerous languages in order to appropriately respond to the needs of his constituents.

(Letter of K. Wong at 1). As one member of Brooklyn's Sephardic community writes:

> He made his Avenue U office available to anyone who
> needed help with anything- getting a form filled out, applying
> for assistance from the city or state, housing problems,
> Access-a-Ride issues. Many of the older people in the
> Sephardic community, especially, depended on Senator
> Kruger's office for these things, and they visited his office for
> free flu shots and cholesterol tests. Senator Kruger was
> always attentive to people who were struggling in our
> society.

(Letter of E. Chehova at 1).

Carl was been recognized by constituents as the "one elected official in [the

Russian community] who truly understood the struggles that Russian-speaking

immigrants confront[.]" (Letter of Rabbi A. Okonov at 1). When congregants of Friends

of Refugees of Eastern Europe (F.R.E.E.) found a homeless man at their synagogue,

they turned to Carl for direction on how to appropriately assist the man. Later, when the

same individual was committed to a psychiatric facility and forced onto medication

against the wishes of family members, Carl successfully advocated for him before the

judge so that the man could come home to his family. *Id.* at 2. *See also* Letter of T. Varzar at 1("Carl didn't know one word of Russian- and to this day I believe he still doesn't. But I can tell you one thing. He hit the ground running when he became our State Senator."); and Letter of F. Stukelman at 1-2 ("Senator Kruger was our mouth, our arms and our legs. When we could not speak, he spoke for us. When we could not fight for ourselves, he fought for us. When we could not walk, he walked for us. He fought the landlords. He brought money into our neighborhood for programs. He helped keep the Brighton Beach Y open. He cried with us at Holocaust Memorial Park, the only park dedicated to those who we lost in the Holocaust. Senator Kruger helped make that park happen years before he was a Senator....Senator Kruger is the first one to stand with us. He understands our pain.").

Carl's remarkable support of Orthodox Jewish families in the community, many of whom struggle to meet the financial tuition burden of sending multiple children to yeshivas for their religious education, is well known. When Albany considered a proposal to cut $15 million in funding to the Comprehensive Attendance Program (CAP), which provides, in part, funding to yeshivas, Carl became a vocal supporter against the proposals. Similarly, Carl also fought for rabbinical students to be eligible for the same Tuition Assistance Program (TAP) as other students in New York State, just as he fought for the reinstatement of city funding for Priority 7 vouchers for preschoolers so that children in the Orthodox Jewish community would be able to attend after-school-programs. *See* Letter of M. Avigdor at 1-2.

Rabbi Yaakov Farhi writes of Carl's heroic efforts upon learning of the plight of a young, abused mother living in a homeless shelter with her child. "It struck him that if

the young mother stayed in the shelter any longer, she and her child would both fall into a permanent despair that would never lift.   In other words, once the woman was convinced that her situation was hopeless, it would be."  Carl found the woman and her child permanent housing within days.  (Letter of Rabbi Y. Farhi at 1-2).  *See also* Letter of Msgr. J. Gigantiello at 1 ("He has been a strong advocate of Catholic Charities and the many programs it promotes, and he has been a dedicated supporter of the Comprehensive Attendance Program (CAP) which allocates funding for parochial and other non-private schools.").

### 3.  Serving The Medical Needs Of The Community

As one whose life had been consumed with meeting the caretaking needs of his mother and sister, and having been an active participant in molding the careers of two physicians, Carl became a champion of healthcare, providing for the medical needs of his community.   For Carl, it became a personal crusade to see that his constituents were provided with quality healthcare.   To that end, as many constituents have noted, he "took on the large health insurance companies because one of his constituents was denied lifesaving medical treatment."  (Letter of I. Kluger at 2).

Josef Kossov, a Practice Manager of the Levit Medical Group, recalls:

> Throughout the years, and on many occasions, Senator Kruger did not hesitate to contact the insurance companies on our behalf and assist us in our ongoing battle to receive timely reimbursements.   He sent letters and, when necessary, arranged meetings to bring swift resolution to these issues.   He assisted us in navigating the system and interceded successfully to expedite payments from providers.

(Letter of J. Kossov at 1).

Ira Kluger, co-President of the Canarsie Historical Society, notes an occasion where Carl intervened and secured medical care for an infant after the insurance company refused to grant approval for life-saving treatment.   Mr. Kluger explains, "Senator Kruger could have sided with the health insurance companies, which clearly had the potential to reward him by contributing to his future campaigns.   However, he did not do so.   As always, he stood up for the underdog; he stood up for what is right." (Letter of I. Kluger at 2).

In a similar situation, a Carl facilitated an insurance deal so that a 19 year-old girl with a "basketball sized tumor" would be able to receive life-saving surgery at a Miami hospital, the only such hospital in the nation capable of offering the treatment.   (*See, Hope at last for tumor teen.* New York Post, Jul. 11, 2003, attached hereto as Exhibit E; and Letter of E. Walansky at 1).

In yet another case, "he was shocked when a radiologic facility, Bay Imaging, shut down suddenly, leaving patients with no access to their MRIs, mammograms and X-rays.   Carl got the attorney general's office involved. Bay Imaging administrators were held accountable – and patients were reunited with their medical records."   (Letter of A. Knoll at 3).

There are many, many additional stories of Carl ensuring that his constituents were provided with access to direct their medical needs.   When Carl learned that Michael Kerr suffered from ulcerative colitis, and that his son suffered from Crohn's disease, he contacted the Crohn's and Colitis Foundation of America to assist them with obtaining a state grant to purchase new computers and office equipment that were

instrumental to providing patients and their families with information and treatment plans about their disease.  (Letter of M. Kerr at 1).

Eli Chehova tells of a similar "mitzvah."  Many years ago, when his son was not responding to conventional treatments for an advanced form of Crohn's disease, Carl took it upon himself to research alternative therapies for the boy, recommend different doctors, and schedule hospital appointments.  Mr. Chevhova's son is recuperating today, due in no small part to Carl's assistance.  (Letter of E. Chehova at 1-2).  When Dorothy D'Aleo's mother was hospitalized after a car accident, Carl called the hospital to inquire about her condition and to recommend hospital staff members who might have been able to assist the family.  (Letter of D. D'Aleo at 1).  *See also* Letter of M. Davidson at 1 ("Each time we needed help, Senator Kruger was there for us.  He helped with appointments, recommended doctors and gave our family comfort.").

### 4.  Support Of The Vulnerable And The Downtrodden, The "Little Guys"

If there is a common thread in many of the letters submitted on behalf of Carl, it is the recognition of Carl's unfailing support for and defense of the "little guys," -- the mom-and-pop stores, the unemployed and uninsured, the senior citizens and the young people.  They all relied on Carl to be their voice, to pursue their needs with tenacity and gusto.  Adrianne Knoll writes:

> There are more Carl vs. Goliath stories than I can possibly mention.  In all of them, Goliath had no idea what he was getting himself into.  Carl was unstoppable in his quest for justice for the disenfranchised New Yorker, for the homeowner buried in taxes, and for the mom-and-pop storeowner trying to stay afloat...Carl fought vociferously and relentless for the most vulnerable constituencies in our society: children, senior citizens, the disabled, the homeless, people with AIDS, people who were victimized simply

> because of their ethnicity or lifestyle. He always said that he
> spoke for those who could not speak for themselves.

(Letter of A. Knoll at 3).

Eli Chehova, who owns a small shop on Flatbush Avenue in

Brooklyn, writes:

> Anyone who owns a neighborhood business in Senator
> Kruger's district always knew he was our number one
> booster. He spoke out often, and in very strong terms, about
> how important it was to maintain our neighborhood
> commercial strips and to protect small business owners from
> sky-high taxes so that we could stay open and continue to
> thrive. He knew that local stores like mine help keep
> neighborhood stable. Senator Kruger understood the
> challenges we face as "mom-and-pop" storeowners,
> challenges that were only getting worse with each passing
> year. He refused to let us get swallowed up by big-box
> stores. He refused to let the economy kill us.

(Letter of E. Chehova at 1).

Steven Barrison, an attorney long involved in small business issues, notes:

> Carl knew and fought for all those that would be harmed
> from these top down one percent type proposals hurting the
> small business owner, sole practitioner, mom and pop
> operator and the negative impact on our city.
>
> . . . .
>
> Carl stood up loud where sometimes generations of small
> businesses were denied basic city services in their streets,
> all for the Mayor's great plan of still more shopping malls in
> our city....He took a lot of heat for his lifelong fight for the
> "little guy" and successfully effected the conversation and
> direction in New York to improve things in many areas in
> which he has been involved, even those where we in the
> community didn't win.

(Letter of S. Barrison at 2).

Dolly Rago is the owner of Dolly's Ices, a small, homemade ice cream business located in "no more than a colorful 'shack' located on the water in Mill Basin." (Letter of D. Rago at 1). Ms. Rago is all too familiar with the challenges of maintaining a small business in the community.

> Whenever a mom-and-pop storeowner such as myself tried to make heads or tails out of the city's confusing 'do's' and don'ts' regulations, I would always turn to Carl Kruger to help me. He always went the distance for me and other small merchants by cutting through red tape to make our lives more manageable. For that, we will always be indebted to him.

*Id.*

Marc Aronson is an attorney who represented many of the storeowners along the boardwalk in Coney Island. He recalls Carl's advocacy on the storeowners' behalf when the city announced plans to close those businesses.

> As in all instances in which Carl takes on a cause that he believes in, he didn't advocate in a half-hearted way. With equal amounts of passion and eloquence, he held a press conference on the Boardwalk with the affected storeowners and visited their businesses. He chided the city administration for its lack of gratitude in turning its back on the poor businesses that kept Coney Island afloat during its leanest times…He criticized a shortsighted development plan that failed to embrace of even acknowledge the charm, history and zaniness that made Coney Island such an appealing candidate for development in the first place.

(Letter of M. Aronson at 1).

Mr. Aronson continues that his clients "knew they'd found a friend in Carl Kruger. Carl received no personal gain in helping these storeowners. It was extremely important to Carl, not only in this instance but throughout his life and career, to fight for the 'little guy'." *Id.* Mr. Aronson, observing Carl's championing the causes of senior citizens, small storeowners, and children, continues, "[Carl] advocated for the

vulnerable, for the disenfranchised, for those who couldn't possibly stand a chance against an overwhelming bureaucracy.  Carl Kruger was a voice for the underdog, without the expectation of any personal reward. He hoped only to make a difference in the lives of the people he helped."  (Letter of M. Aronson at 1-2).

*See also* Letter of T. Varzar at 1 ("When the "little" people in our community sought his assistance, he was always there for them.  No issue was too small, no problem was too big."); Letter of L. Jannis at 2 ("The small business community was Carl's bread and butter.  'Larry,' he said to me, 'let's work on your business like a campaign.  I know we can pull it together.'"); Letter of G. Mitsopoulos (Carl attempted to help save his pharmacy from closure after the implementation of Medicare Part D, which lowered reimbursements and decreased the small pharmacy's cash flow.); and Letter of M. Schachner at 1 ("My business is one of the few kosher delicatessens left in Brooklyn...Carl Kruger has been the small business owner's staunchest defender against the giant retailer—for the little guy trying to remain standing while the giant tries again and again to cut him down.").

### B. Carl Became An Essential Figure In His Beloved Community, And His Resignation From Public Service Will Be A Severe Loss To His Constituency

Carl's omnipresence will make the loss to his community all the more tragic.  The letters from Carl's constituents speak to the scope of his presence in their lives, and how acutely his absence will be felt by those who have come to rely on his help and his support.  They will miss his inquiring after their lives and loved ones, his steadfast presence in their most joyous as well as their darkest moments, and most of all, his voice standing up for their causes.

42

Edward Sutton writes:

> Unfortunately our good friend and community representative is gone.  A friend and a powerful voice for our community has been silenced.  The person that our community could always count-on for a voice on behalf of our community charitable institutions is no longer there for us.

(Letter of E. Sutton at 1).

*See also* Letter of S. Barrison at 3 ("We as a city are the ones hurt without Carl Kruger out there fighting for our communities, small businesses, fairness, in these processes and quality of life issues."); Letter of M. Tobin at 2 ("[I] do know Carl Kruger, the compassion he has shown me and so many others and his truly burning desire to help others.  He has now lost that ability and in the process, we have lost his help."); Letter of R. Lieberman at 1 ("For 18 years I have been coming to Senator Kruger's office.  They help me fill out my re-certification for food stamps and fight on my behalf.  Without them I don't know what I would do.); and letter of T. Varzar at 1 ("Now the city is going ahead with [building a cement boardwalk] and we don't have Carl as our senator to stand with us and fight.  And that is our great loss.").

Marc Aronson writes:

> He was a full-time Senator, and not part-time as many politicians unfortunately are.  It is a terrible loss of the people of our city and state that Carl Kruger is no longer advocating on their behalf and taking on battles that no one else dared to take on.  Carl was a fearless public servant, unafraid of criticism and emboldened by fights that many would regard as unwinnable.

(Letter of M. Aronson at 2).

Fira Stukelman writes:

> I learned that my Senator Carl Kruger has resigned his office and will no longer be our person to go to.  You don't know

43

> what that means.  Senator Kruger was our mouth, our arms and our legs.  When we could not speak, he spoke for us.  When we could not fight for ourselves, he fought for us.  When we could not walk, he walked for us.  He fought the landlords.  He brought money into our neighborhood for programs.  He helped keep the Brighton Beach Y open.  He cried with us at Holocaust Memorial Park...Senator Kruger makes things happen for us.  He keeps our world intact.

(Letter of F. Stukelman at 1-2).

Carl's absence will be felt not only in his district, but across the state, as Carl has served the needs of not only the constituents in his own district, but New Yorkers everywhere.  Thus, many grateful individuals write of Carl's assistance with various causes in their own neighborhoods, acting not in the capacity of an elected official, but as "a concerned citizen who was involved in the communities in which he lived and worked." (Letter of M. Tobin at 1).  For example, community members write of Carl mediating negotiations between local residents and an adult movie store owner who wanted to open a business in the community (*Id.*); visiting a classroom in Levittown Long Island, far from his district, to teach a class about government and civics (Letter of L. Jannis at 1); and securing permission to place commemorative plaques marking historical buildings (Letter of I. Kluger at 1).  Mr. Kluger writes, "The fact that Senator Kruger represented a neighboring district did not deter him from assisting me to his fullest capacity, nor from being present to lend his support at the dedication ceremonies for these plaques...Senator Kruger never refused a single request for assistance on my part" *Id.* at 1-2.

### C.  Carl Kruger Is Deeply Remorseful, Humbled, And Humiliated Beyond Words

Today, those close to Carl see a man truly humbled.  He has been transformed from a man who always had the answers -- to whom others turned to for help -- to a man who must now forever carry the shame and knowledge that his transgressions brought about not only his own destruction, but that of his family as well.  "He has shamed his family and himself.  If you knew Carl Kruger the way we do, that punishment every day of his life is more than most people could bear."  (Letter of T. Varzar at 2).  "A man who strode purposefully and invincibly through life's land mines has been told that the war is over, and he's the loser.  Carl Kruger has spent a lifetime asking nothing more than to help people.  Now he's learned that his help is not wanted." (Letter of M. Aronson at 2).

These same people also acknowledge that, while they are disappointed with the criminal conduct that has brought Carl dishonor and deep regret, they nevertheless still try to see the whole of the man who, on balance, is extraordinary.  They plead for this Court to do the same.  "I do not excuse or diminish what Carl Kruger or Michael Turano have admitted doing.  I only see it as part of the whole; serious human failings, but ones that should be mitigated because of all the good they have done.  Mercy and compassion are what I ask you to consider when judging them."  (Letter of B. Tracey at 2).

See also Letter of M. Aronson at 1 ("Carl's overwhelming desire to help, to ease the path for others, is still very much alive.  This is not something that can be extinguished, nor should it be....There are many battles still to be fought, and I cannot think of anyone better equipped to fight them than my good friend Carl Kruger."); Letter of Kroening Family at 2 ("These last months, Carl has taught our family another lesson,

45

and that's about grace under pressure.  From Carl, our children understand that a single mistake does not define who you are.  It's the totality of your life that counts."); and Letter of D. Weber at 3 ("I am one of those people lucky enough to know him within the larger framework of his career- a career spent fighting for our children's future, fighting against bureaucracy, and fighting for what is morally and ethically right.  Senator Kruger has spent his lifetime fighting the good fight—and that is an achievement worthy of our greatest respect.").

## V.   CARL KRUGER'S GUIDELINES RANGE, PLEA AGREEMENT AND PRE-SENTENCE REPORT

### A.  The Sentencing Guidelines As Applied In This Case And As Incorporated Into The Plea Agreement

The adjusted offense level of 31 was calculated as follows:

| Category | Points |
|---|---|
| Base Offense Level (U.S.S.G. § 2C1.1(a)(1)) | 14 |
| Offense Involved More Than One Bribe (U.S.S.G. § 2C1.1(b)(1) | +2 |
| Value of The Bribes and/or a Reasonable Estimate of the Benefits Received In Exchange for the Bribes is Greater than $400,000 but less than $1,000,000 | +14 |
| Offenses Involved an Elected Public Official | +4 |
| Acceptance of Responsibility Adjustment (U.S.S.G. § 3E1.1) | - 3 |
| Total Adjusted Offense Level | 31 |

(Plea Agreement p. 3).  For a defendant with a criminal history category of I, as with Mr. Kruger, the advisory Guidelines range associated with an adjusted offense level of 31 is 108 to 135 months imprisonment.

## B. The Plea Agreement

The Plea Agreement between Carl Kruger and the Government contemplates a likely adjusted offense level of 31 under the Guidelines.  (Plea Agreement p. 3).  While the parties agreed that this adjusted offense level is correct, Mr. Kruger has the right, consistent with the Plea Agreement, to seek a sentence below the applicable range of imprisonment based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).  *Id.*  Accordingly, we ask Your Honor to consider all of the information set forth herein and in the more than 80 letters addressed to the Court in arriving at an appropriate sentence for Mr. Kruger.  We respectfully submit that an appropriate sentence as to Mr. Kruger is a sentence well below the Guidelines range set out in the Plea Agreement.

## C. Carl Kruger's Pre-Sentence Report

Carl Kruger's Pre-Sentence Report ("PSR")[8] concludes, as with his plea agreement, that his Guidelines range is 108 to 135 months based on a Total Offense Level of 31.

Counsel takes no issue with the Probation Department's rote calculation of Mr. Kruger's Guidelines range.  However, we submit that a more thorough examination of the circumstances of this case as described in the PSR will reveal that it differs substantially from a typical bribery/corruption case.   This difference, while not

---

[8] All references to the PSR refer to the initial draft PSR sent to counsel by the Probation Department on March 21, 2012.  Counsel intends to lodge objections related to the Probation Department's inclusion of certain speculative and irrelevant allegations.

technically exculpatory, weighs heavily in favor of leniency in Mr. Kruger's ultimate sentence.

### 1.  The Origin Of Olympic Strategic Development

The PSR states that "Carl Kruger concealed his receipt of the bribes by funneling the payments to shell companies established by [Michael] Turano." PSR ¶ 29.  In truth, Olympic Strategic Development ("OSD") was conceived by Carl and later established by Michael Turano as a legitimate second career for Michael and Gerard Turano as the financial rewards of running an OB/Gyn practice were becoming increasingly outweighed by the risks.  Though it was ultimately the conduit through which improper payments were regrettably made to Michael Turano, OSD was not created for the purpose of doing so.

As Michael and Gerard Turano were confronting mounting challenges in the medical profession, including long hours, a significant decrease in reimbursements, and even greater increases in malpractice rates, Carl began to envision a second career for them.  They understood that the trend toward higher rates and lower reimbursements would only continue and relying on their medicine practices as a sole source of income would soon become financially unfeasible to maintain.[9]

In addition to the diminishing returns and increasing demand of time and effort required by their practice, Michael had also developed an injury to his wrist from performing obstetric deliveries.   Simultaneously, Michael and Gerard were also

---

[9] This issue was becoming and still is a nation-wide dilemma.  *See*, Kavilanz, Parija B., Rx for money woes: Doctors quit medicine (2009), available at http://money.cnn.com/2009/09/14/news/economy/health_care_doctors_quitting/index.htm)

watching many of their colleagues branch out into more lucrative careers in addition to medicine.

Once again, the Turanos turned to Carl Kruger. Carl Kruger writes:

> Many times over the years Michael and Gerard had come to me for advice on other matters, and I was always there to assist. I helped them with college/medical school applications, advised them on residency programs, and, using my knowledge of direct mail from running campaigns, I helped them establish successful private practices. True to form, I stepped in to assist this time, too.

(Letter of C. Kruger at 2, attached hereto as exhibit A).

Carl knew that Michael and Gerard were knowledgeable about their community, well-liked by all, personable, and consummately civic minded. Carl advised Michael and Gerard to apply for their real estate and insurance licenses, a lengthy and arduous process. Carl envisioned that, when licensed, he could refer startup businesses to these newly qualified businessmen. In this way, they could augment the income from their medical practices. Michael and Gerard studied for and ultimately received their respective licenses, and Carl Kruger began introducing them as real estate agents/consultants to colleagues, friends, and prominent members of the community who previously knew them only as physicians.

Michael and Gerard, excited to hit the ground running, decided on the name Olympic Strategic Development. They spent a significant amount of time using their familiarity with local business owners to try and fill retail spaces at Canarsie Plaza in addition to acting as medical and community-based consultants at countless meetings aimed at restructuring Parkway Hospital after it was forced to close in its current form by

49

the Berger Commission.  There were some early failures and a lot of learning left to do, but their intentions were originally honest.

It is difficult to pinpoint exactly when this innocent plan turned into a corrupt relationship, but it is clear that Carl Kruger's initial idea in assisting in the creation of OSD was legitimate. Eventually, however, Carl crossed the line from using his connections as a source of referrals to help his family, to the crimes which bring him before this Court for sentencing.  Carl explains:

> I envisioned and helped Michael create a new rewarding career and source of income.  My intentions in helping them develop a consulting, real estate, and insurance practice began with a pure heart.  At some point, which I can still not put my finger on, I allowed things to go awry and caused indescribable heartache and pain.

*Id.*

What is worse for Carl Kruger is that he brought Michael Turano along with him -- something he will regret every day of his of life, a significant punishment in itself.

### 2. Carl Kruger Did Not Personally  Benefit From The Monies Received By Olympic Strategic Development

In an attempt to describe Carl Kruger's role in the Turano family, the PSR states, "Kruger has a close relationship with the Turano family, and had a particularly close relationship with Michael Turano.  Accordingly, by sending the monies to the Turano family, Kruger provided for their mutual benefit."  PSR ¶ 29.

While Mr. Kruger and Michael Turano had a loving, familial relationship, the PSR's conclusion regarding their "mutual benefit" is specious and misleading.  This was not the average bribery/political corruption case in which a venal politician took bags of cash, vacations, or other personal benefits in exchange for official actions. *See, e.g.,*

50

*United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) (Mayor of Bridgeport Connecticut entertained and given meals, clothing, wine, jewelry, and cash by the bribers in exchange for official acts). Carl Kruger did not seek to enhance his personal wealth or his power within the Senate in exchange for taking official acts. It is uncontroverted that Carl personally led a humble and modest life before, during, and after the existence of the charged conspiracy.

Carl did not take any funds, cash or anything of value for himself, nor did he ever take any vacations. In fact, when Carl's passport was turned over to the FBI at the time of his arrest, it was entirely blank and without single stamp in it. Carl has never left the continental United States in his lifetime – he has never even visited the west coast.

Carl does not and never did live with the Turanos at their Bassett Avenue residence. With the exception of overnight trips to Albany for work and a brief stay in the hospital after his hip surgery, Carl, despite the media's assertions to the contrary, has slept each night in the modest house he shares with sister and brother-in-law in Canarsie every night since 1968. Although Carl assisted the Turanos throughout the purchase, renovation, and furnishing of the Bassett Avenue residence, he never had any ownership interest in the house.[10]

Carl Kruger lived modestly on his $80,000 per year Senate salary before, during, and after existence of this conspiracy. In fact, during the period in which more than a million dollars flowed into the Olympic Strategic Development account, Carl took out personal loans against his pension to help pay his own credit card bills. (*See*, Letter

---

[10] The house itself was not purchased with proceeds of the crimes charged in this case, but with income earned from the Turano medical practices and the proceeds of the sale of Dorothy Turano's original home.

Confirming History of Loan Account, attached hereto as Exhibit F).  Indeed, as a result of these pension loans, several of Mr. Kruger's later credit applications were denied. Finally, while Mr. Kruger could have reached into the OSD account to repay his personal loans, he did not.   Instead, he took bi-weekly deductions from his Senate paycheck to cover his loan payments.  These loans have since been paid back in full and not one dollar came from Olympic Strategic Development funds.

Accordingly, Carl Kruger never received any personal dollar benefit in exchange for any of the official acts taken by him in this case.  He understands that payments to a third party may result in his own criminal liability as if he had personally benefited. However, this atypical arrangement clearly demonstrates the distinctions between this case and a run-of-the-mill bribery/political corruption case in which greed by the public official is at the heart of the conduct.   Here, Carl Kruger's conduct was criminal, but his motivations were not personal.

### 3. The Official Acts

Carl Kruger pled guilty to performing official acts in exchange, or partially in exchange, for improper payments made to a third party.  These official acts taken by Mr. Kruger, however, were never detrimental to the public interest, nor were they really inconsistent with his prior positions on many of these same issues.  This discussion is not an attempt to minimize the effect that Mr. Kruger's crimes had on the public good. He is aware that it makes no difference under the law that he would have lawfully and properly performed the same official acts even if there was no bribe.  Further, he recognizes that it is not a legal defense to his crimes if the act taken by him was motivated by both proper and improper motives.

However, it must be pointed out again that this is <u>not</u> the typical corruption case in which the benefits sought by the briber placed the public good in jeopardy. *See, e.g. United States v. Soumano*, 318 F.3d 135 (2d Cir. 2003) (Social Security Administration representative asked to issue social security cards for undocumented aliens in exchange for payment). Rather, counsel for Carl Kruger respectfully submit that the official acts connected to this case were essentially in favor of the public good and were either consistent with positions he has held throughout his career or were strategic sacrifices made by Mr. Kruger in a complicated political landscape.

## VI.   THE LAW PERMITS A BELOW-GUIDELINE SENTENCE

### A.  The Court's Discretion To Depart From The Guidelines

As this Court is well aware, in *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the then-mandatory Sentencing Guidelines system violated the Sixth Amendment. As a result, the Court in *Booker* rendered the Sentencing Guidelines merely "advisory." Later, the Court further clarified its position, holding that in addition to being advisory, the Guidelines "now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 128 S.Ct. 558, 564 (2007). While a sentencing court must begin the process of determining an appropriate sentence for a criminal defendant by calculating the applicable Guidelines range, it "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall v. United States*, 128 S.Ct. 586, 596 (2007). Section 3553(a), "as modified by Booker, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not

greater than necessary' to accomplish the goals of sentencing..." *Kimbrough*, 128 S.Ct. at 570 (citing sentencing goals set forth at 18 U.S.C. § 3553(a)(2)(A)-(D)).

Finally, in *Nelson v. United States*, 129 S.Ct. 890 (2009), the Supreme Court re-emphasized that the guidelines are only advisory <u>and</u> are not to be presumed reasonable. The Court explained:

> Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable. In <u>Rita</u> we said as much, in fairly explicit terms: "We repeat that the presumption before us is an *appellate* court presumption. . . . [T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." And in [*Gall*] we reiterated that district judges, in considering how the various statutory sentencing factors apply to an individual defendant, "may not presume that the Guidelines range is reasonable" . . .
>
> The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.

*Id.* at 891 (internal citations omitted).

Section 3553(a) specifically directs that courts "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of [§3553(a)]." 18 U.S.C. § 3553(a) (emphasis added). The § 3553(a) factors include (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the

advisory guideline range; (5) any pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims of the offense.   18 U.S.C. § 3553(a).   *See Booker*, 543 U.S. at 224.

A Guideline-authorized downward departure is no longer required in order to justify a below-Guidelines sentence.   After *Booker*, a sentencing court need not find that a particular 3553(a) factor is "extraordinary" or sufficient to take a case out of the "heartland" in order to justify a below-guidelines sentence.   *See Gall*, 128 S.Ct. at 595; *Rita v. United States*, 127 S.Ct. 2456, 2461 (2007).   Even those factors that would not necessarily result in the granting of a downward departure – or that were expressly prohibited or deemed irrelevant by the Sentencing Guidelines – must now be considered under the mandate of § 3553(a).   *See Jones*, 531 F.3d at 181.   Section 3553(a) provides that, in determining the appropriate sentence, the district court must "make an individualized assessment based on the facts presented," which is "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'"   *Gall,* 128 S.Ct. at 597 (emphasis added).

A non-Guidelines sentence is also warranted where a sentencing judge finds that a particular Guideline or Guideline range fails to properly reflect § 3553(a) considerations, reflects "unsound judgment," or when "the case warrants a different sentence regardless."   *Rita*, 127 S.Ct. at 2465, 2468.   The Supreme Court recently clarified this point:

> Even when a particular defendant...presents no special mitigating circumstances, such as no outstanding service to country or community, no unusually disadvantaged childhood, no overstated criminal history score, no post-

offense rehabilitation, a sentencing court may vary
downward from the advisory guideline range. . . . The only
fact necessary to justify such a variance is the sentencing
court's disagreement with the guidelines . . .

*Spears v. United States*, 129 S.Ct. 840, 842 (2009) (*per curiam*) (citation omitted).

## B. A Below Guidelines Sentence Is Appropriate In This Case

Section 3553(a) allows a sentencing court to consider a defendant in all of his or

her unique humanity, and as this Court so eloquently explained:

> [S]urely, if ever a man is to receive credit for the good he has
> done, and his immediate misconduct assessed in the context
> of his overall life hitherto, it should be at the moment of his
> sentencing, when his very future hangs in the balance.  This
> elementary principle of weighing the good with the bad,
> which is basic to all the great religions, moral philosophies,
> and systems of justice, was plainly part of what Congress
> had in mind when it directed courts to consider, as a
> necessary sentencing factor, "the history and characteristics
> of the defendant."

*United States v. Adelson*, 441 F.Supp.2d 506, 513-514 (S.D.N.Y. 2006).  *Accord Gall*,

128 S.Ct. at 598 ("It has been uniform and constant in the federal judicial tradition for

the sentencing judge to consider every convicted person as an individual and every

case as a unique study in the human failings that sometimes mitigate, sometimes

magnify, the crime and punishment to ensue.").  *See also* 18 U.S.C. § 3661; U.S.S.G. §

1B1.4 (sentencing court not limited with respect to the information concerning a

defendant's background, character and conduct that it may consider for the purpose of

imposing an appropriate sentence).

As the many wonderful letters from members of the public and the many human

service awards received by Mr. Kruger illustrate, the acts which serve as the predicate

for Carl Kruger's conviction by his plea stand in stark contrast to the rest of his life.  He

has never before been convicted of any crime.  Indeed, throughout his life, Mr. Kruger

has been a devoted public servant; a solid patriarch in a family that likely would have wholly dissolved without him; and a trusted, committed, loyal friend to many, offering his assistance whenever needed.   His lifetime of selfless giving to the community, his devotion to the Turanos, and his honest remorse present a combination of circumstances that, we submit, merit this Court's consideration.

Under the unique facts of this case, a below-Guidelines sentence would still reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence to criminal conduct. § 3553(a)(2)(A) and (B).   We also note that in the case of Mr. Kruger, a first-time, non-violent offender, the Court need not consider the need "to protect the public from further crimes of the defendant," § 3553(a)(2)(c), nor is there any need to provide Mr. Kruger with "any particular educational or vocational training." § 3553(a)(2)(D).   A below-Guidelines sentence is clearly appropriate.

### C. Carl Kruger Is Filled With Remorse; He Has Accepted Responsibility For His Conduct And There Can Be No Concern About Recidivist Behavior

Mr. Kruger's remorse and acceptance of responsibility are genuine.   He has candidly admitted his crime and his regret for his shameful conduct to everyone, not only in open court through a highly emotional guilty plea, but also during his PSR interview.   His personal letter to your Honor further expresses his great remorse and his shame – not only because he faces prison, but because he strayed from his personal path of righteousness.   As Dottie Turano observes, "Carl has devoted his life to his community and public service...In some small measure, he's lost the will to live because he feels he's let down his own family...and cause[d] us irreparable harm and disgrace." (Letter of D. Turano at 1).

Carl Kruger, in a heartfelt letter to the Court, provides your Honor some insight into his conduct and its consequences.  He writes of his shame and remorse, and also his deep acceptance of responsibility for the terrible choices he made: "My contrition, sadness and remorse is overwhelming and that is now what defines me as I come before the Court to be sentenced....I know that my actions were illegal.  I have caused the people I love to suffer, to weep, to fear for the future.  I am tormented by this knowledge, and deservedly so...I can only hope that others come to realize that every step is a step that has to be measured, and that an elective office is a privilege, not an entitlement -- a privilege that has to be renewed every day, with a responsibility to look at every action and its consequences." (Letter of C. Kruger at 2-5, attached hereto as exhibit A).

Courts in this Circuit and throughout the country have recognized a defendant's genuine remorse and acceptance of responsibility as a legitimate basis for a downward variance.  *See, e.g., United States v. Gardellini*, 545 F.3d 1089, 1091 (D.C. Cir. 2008) (acceptance of responsibility and minimal risk of recidivism); *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (acceptance of responsibility); *United States v. Howe*, 543 F.3d 128, 132 (3d Cir. 2008) (defendant "truly remorseful).  We urge this Court to consider Mr. Kruger's remorse and acceptance of responsibility, together with the many other compelling facts we have presented, in fashioning an appropriate, below-Guidelines sentence.

### D.  The Good Carl Kruger Has Done Throughout His Life Far Outweighs The Damage Caused By His Regrettable Criminal Conduct

Courts have recognized that a defendant's good works – and, in particular, the fact that a defendant has given of his time – are a basis for a sentence below a

Guideline sentence. *See United States v. Serafini*, 233 F.3d 758, 774-75 (3d Cir. 2000) (downward departure[11] proper since the facts showed the defendant "as an exceptionally giving person" and the defendant's acts "weren't acts of just giving money, they were acts of giving time, of giving one's self.") *Accord Adelson*, 441 F.Supp.2d at 513 (similar result using § 3553(a) factors).

The many letters submitted in support of Carl Kruger describe his generosity, kindness to others and good works engaged in throughout his life. His conduct has truly been "extraordinary" and therefore forms a legitimate basis for a downward variance from the advisory guidelines sentence set forth in the plea agreement. *Id.*

Where, as in this case, the public service work engaged in by a defendant is extensive in scope and indeed "extraordinary," courts throughout the country have recognized the authority of a sentencing court to order a substantial downward variance from the Guideline sentence that would otherwise apply. *See, e.g., United States v. Tomko,* 562 F.3d 558, 572 (3d Cir. 2009) (affirming variance to a sentence of probation from a recommended range of imprisonment of between twelve and eighteen months due largely to the defendants "exceptional" charitable acts and good works); *Thurston,* 544 F.3d at 26 (affirming variance to a sentence of three months' incarceration and 24 months supervised release from a recommended guideline sentence of 60 months' imprisonment based in part on the defendant's "charitable work, community service,

---

[11] Carl Kruger, under his plea agreement, cannot request a formal departure based on the "extraordinary" nature of his lifetime of public service of good deeds. However, we submit that in asking this Court analyze this case using the non-Guidelines factors set forth in § 3553(a), the standard to be applied is less stringent than would have been required in pre-*Booker* formal departure under Section 5H1.11 of the Sentencing Guidelines which provides, "[m]ilitary, civic, charitable or public service; employment related contributions and similar prior good works are not ordinarily relevant in determining whether a departure is warranted."

generosity with time, and spiritual support and assistance to others."). Where such good works have been "extraordinary," a downward departure, or in this case, a variance, is appropriate, "if the [discouraged] factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *United States v. Canova,* 412 F.3d 331 (2d Cir. 2005), *citing Koon v. United States*, 116 S.Ct. 2035 (1996). In *Canova*, the Court affirmed a downward departure, finding that the record, "plainly demonstrate[d] the 'exceptional degree' of [the defendant's] public service and good works." *Id.* at 358-359.

In either case – a downward variance or a downward departure – a very important factor that a sentencing court is to consider when determining the extent of a departure is the nature, extent, and quality of the contributions by the defendant. *See, e.g., Tomko* at 572 (noting that the defendant not only contributed money but also his personal time). Some courts have recognized that the "time" contributed by a defendant to a charitable organization is to be more highly rewarded than where the contributions of a defendant consist exclusively of the giving of money. *Id.* In *Serafini*, for example, the Third Circuit found that, because "[s]everal constituents and friends described situations in which Serafini extended himself to them in unique and meaningful ways during times of serious need," the district court's downward departure was not an abuse of discretion since the facts depicted the defendant "as an exceptionally giving person." *Serafini*, 233 F.3d at 773-774. The court noted that the defendant's acts "weren't acts of just giving money, they were acts of giving time, of giving one's self." *Id.* at 775. Notably, in *Serafini*, the Third Circuit highlighted the letters of just three individuals testifying to the defendant's charitable works: the first

60

came from a friend who sought and received from the defendant  a $300,000 guarantee to secure treatment for a family member's brain tumor; the second came from an individual (and constituent of the defendant, who was an elected official) who, having sustained serious injury in an accident that rendered him incapacitated, was hired by the defendant and who credits the defendant with "turning his life around"; the third letter came from a widow who approached the defendant because she was about to lose her home and to whom the defendant gave a check for $750 with no expectation of repayment. *Id.* at 774 and 787.

In contrast to *Serafini* are the over 80 letters submitted in support of Carl Kruger which demonstrate that he not only performed his duties as a New York State Senator exceptionally well, but that he also engaged in hundreds, if not thousands, of extremely impressive acts of public service, and perhaps more telling, in ordinary and extraordinary acts of kindness and empathy on a daily basis, through which he has altered the lives of countless people.  In this way, he is most like the defendant in *Adelson*, for whom "[o]ver 100 persons from all walks of life submitted detailed letters attesting, from personal knowledge, to Adelson's good works and deep humanity."; or *Tomko* where "[s]everal dozen letters written on Tomko's behalf prior to his sentencing also demonstrate Tomko's community ties and extensive charitable works." *See Adelson*, 441 F.Supp.2d 506 at 513; *Tomko*, 562 F.3d at 572. *See also United States v. Cooper*, 394 F.3d 172, 178 (3d Cir. 2005) (affirming the District Court's order granting Cooper a four-level downward departure given the defendant's exceptional service); *United States v. Woods*, 159 F.3d 1132, 1136 (8th Cir. 1998) (upholding defendant's downward departure for charitable activities, which included bringing two troubled young

women into her home and paying for them to attend a private high school, as well as helping to care for an elderly friend, where the court found no basis to overturn the district court's finding that these efforts were exceptional); *United States v. Jones, 158 F.3d 492* (10th Cir. 1998) (affirming departure based in part on defendant's long history of community service and his strong support in the community, even among the family of the victim).

Here, as demonstrated in so many of the letters written to your Honor, the acts of public service, and private service to others, far exceed the "ordinary." Not only has Mr. Kruger served the people of the state of New York in the Senate in a full-time capacity far beyond many of his part-time colleagues, but many letters also attest to Mr. Kruger's selfless acts in assisting others in their time of need, and of his giving of himself in ways far and above what is normally expected of a politician. It is respectfully submitted that, now in his darkest hour, Mr. Kruger should be given great credit for the generous and kind life that he has led, a life completely out of character with his offense conduct.

In this case, Carl Kruger brings to his day of sentencing a lifelong commitment to the people of the state of New York and his beloved community, and an unfettered devotion to his family, including the Turanos. Most impressive are the countless occasions in which Mr. Kruger provided personal time and tireless effort to individuals in need and to non-profit organizations that, in turn, provide services to needy individuals and their families. Counsel respectfully submits that in this case, it is appropriate and important to consider the recognized departure for "extraordinary" public service, cited with approval by so many courts, including this Court which, in *Adelson*, noted that

one's lifetime of good work must count for something when standing before a sentencing court.

### E. Carl Kruger Has Already Gravely Suffered

Courts frequently recognize that collateral consequences – whether the loss of a good job or emotional distress – are a legitimate basis for a downward variance. *See, e.g., Gardellini*, 545 F.3d at 1091 (affirming downward variance based on various factors, including the fact that the defendant had "already 'suffered substantially' due to his prosecution, noting that [he] had been treated for 'depression due to the stress of the instant investigation.'"); *United States v. Samaras*, 390 F.Supp.2d 805, 809 (E.D.Wis. 2005) (where defendant convicted of fraud warranted a below-Guideline sentence, in part because "as a consequence of his conviction and sentence, defendant lost a good public sector job").

In this case, the collateral consequences suffered by Mr. Kruger are real and significant. As detailed *supra*, and in the many letters submitted on Mr. Kruger's behalf – including in his own heartfelt letter – Mr. Kruger has suffered considerable public disgrace and grave humiliation as a result of his criminal conduct.

Carl's fellow community activist, Edward Sutton, recalls meeting Carl shortly after his plea:

> I saw a different person, a person who was sullen in despair, a shell of the friend I knew. The friend we all knew is a broken man. Senator Kruger has taken responsibility for his actions. He has destroyed himself and in the process he has harmed his family and anything that was meaningful to him. All is lost to him.

(Letter of E. Sutton at 1).

This intangible punishment should be considered by your Honor in fashioning an appropriate sentence that is "sufficient but not greater than necessary" to achieve the purposes of punishment. We respectfully submit that the Court may and should consider the collateral consequences suffered by Mr. Kruger as a result of his criminal conduct and deem these consequences as having also served the goals of punishment as set forth in 18 U.S.C. § 3553.

### F. Sentence Parity

In imposing sentence, a sentencing court should consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" 18 U.S.C. § 3553(a)(6) (emphasis added). *See also, Gall* 128 S.Ct. at 600; *Kimbrough*, 128 S.Ct. at 558; *Rita*, 127 S.Ct. at 2456. Every political corruption case is different and the sentence that may be appropriate for one may not be suited for another. However, there is a need for some sense of consistency. *See United States v. Parris*, 573 F. Supp.2d 744, 751-2 (E.D.N.Y. 2008) (quoting *United States v. Wills*, 476 F.3d 103, 109 (2007) (abrogated on other grounds) for the proposition that: "Even fulfilling their primary purpose with eye toward the particular circumstances before them, judges must be mindful of the general goal, however elusive, of national consistency.")).

While the conduct that brings Carl Kruger before this Court for sentencing falls under the vast umbrella of political corruption, there exist significant gaps between Mr. Kruger's conduct and that of the more common scenario in which the public official willingly undercuts the needs of his or her community in order to personally gain from their misdeeds. Carl Kruger stands before this Court in stark contrast to this clichéd state of affairs – in his criminal conduct, post-conviction behavior, and prior record of

64

accomplishments.   To this end, counsel respectfully directs this Court to two recent cases from this District in which New York State legislators were convicted of official corruption but received well-below Guidelines sentences, despite clear evidence to suggest that their acceptance of responsibility was not at all sincere.

In *United States v. Seminerio*, 680 F. Supp.2d 523 (S.D.N.Y. 2010), Anthony Seminerio[12] was a New York State Assemblyman who "[a]ccepted bribes and engaged in extortion as part of a decade long scheme to use his office—both literally and figuratively—for personal gain and at the expense of the public trust." *Seminerio*, 680 F. Supp.2d at 526.

After his guilty plea, Seminerio claimed "in his pre-sentence submissions that he is only accountable for a 'single, isolated, criminal act'-an 'extremely aberrant and atypical episode' in which he failed to disclose a conflict of interest." *Seminerio*, 680 F. Supp.2d at 526.  This assertion by Seminerio then required Judge Buchwald to hold a Fatico hearing in which she concluded that Seminerio "[b]reached the public trust not only by failing to disclose his conflict of interest, but also by receiving payments for certain actions that plainly would be expected of a reasonably diligent legislator. . . received payments for actions that would not be expected of a diligent public servant, such as collecting debts, using official clout to maintain contracts that were lucrative to the Assemblyman, and even trading state funding for jobs." *Id.* at 544    Judge Buchwald then determined that Seminerio's guidelines range was 135-168 months, but

---

[12] There is <u>no</u> connection between Carl Kruger and Anthony Seminerio beyond the fact that Seminerio's name appears in the Indictment.  David Rosen conspired with each of them separately.  They are not mentioned in the same counts of the Indictment, nor does there exit any factual connection between them.

sentenced him instead to 72 months of imprisonment despite clear evidence that Seminerio did not ever really accept full responsibility for his criminal conduct.

Carl Kruger's conduct after his plea before Your Honor demonstrates a different set of attributes. His humbling plea conveyed genuine contrition and acceptance of responsibility which he has maintained throughout the very difficult period between his plea and sentencing.

Another example is the case of Efrain Gonzalez, a New York State Senator who misappropriated public funds for his personal use (including credit card bills and membership fees at a vacation club in the Dominican Republic) through the designation of member item money through sham non-profit organizations. Gonzalez was arrested in 2006, and then consumed Judge Pauley with "protracted pre-trial tactics. Indeed, [the district] Court fixed four separate dates for jury selection and trial." *United States v. Gonzalez*, No. 06-CR-726 (WHP), 2010 WL 1640186 at *1 (2010). "Eventually, trial was scheduled for May 4, 2009. In mid-April 2009, Gonzalez's attorney [] asked the district court to, inter alia, postpone the start of the trial for one week and to allow Gonzalez to change attorneys . . . . The Court rejected the suggestion that the disagreements [his attorney] described between himself and Gonzalez constituted a sufficient basis for a change of attorney so shortly before trial." *United States v. Gonzalez*, 647 F.3d 41, 45-46 (2d Cir. 2011). On May 8, 2009, Gonzalez pled guilty.

The Court initially scheduled sentencing for August 7, 2009, but adjourned it to mid-October at Gonzalez's request. *Id.* at 47. On September 24, 2009, a supplementary plea hearing to address forfeiture issues was held in which Gonzalez reaffirmed his plea and sentencing was re-scheduled for November 13, 2009. In the

meantime, Gonzalez, again, asked for new counsel.  Judge Pauley relieved Gonzalez's attorney and appointed CJA counsel. In February 2010, Gonzalez attempted to withdraw his guilty plea, submitting an affidavit in furtherance of his application which stated, "Before and up to the May 8, 2009 hearing, I did not wish to plead guilty". *Id.* at 51.  Gonzalez signed this affidavit despite repeated assertions to the contrary during two allocutions. *Gonzalez,* 2010 WL 1640186 at *1-4.

Despite Gonzalez' years of dishonesty with the Court and a dubious and unsuccessful attempt to withdraw his guilty plea, Judge Pauley determined Gonzalez's Guidelines Range to be 108-135 months, but sentenced him to principally 84 months of imprisonment – a substantial variance.   Again, the contrast that exists between the criminal conduct and post-plea behavior and demeanor between these two otherwise similarly-situated defendants cannot be ignored.

Gonzalez and Seminerio are only similar to Carl Kruger in that they were members of the New York State legislature with no prior criminal record and were convicted of official corruption.  Gonzalez and Seminerio received sentences well below the bottom of their respective Guidelines range; Efrain Gonzalez Jr. received a nearly 25 percent reduction and Anthony Seminerio received a nearly 50 percent reduction.  In contrast to these two public officials, Carl Kruger demonstrated significantly greater contrition, full acceptance of responsibility, great respect for the Court, and has manifested appropriate conduct throughout these difficult proceedings.   Additionally, where Gonzalez and Semerio were the primary recipients of the illegal proceeds and used them to live an enhanced, personal lifestyle, Carl Kruger is in the unique position of not having personally received any proceeds from his illegal conduct.

After combining the conduct underlying Carl Kruger's conviction with his otherwise exemplary record of service and the extraordinary amount of good that he has done for New York State and individual constituents, and then comparing the larger picture with the ultimate sentence received by Gonzalez and Seminerio, we submit that a substantially larger downward variance from the Guidelines is appropriate for Carl Kruger.

### G. The Court Should Impose A Sentence It Deems Sufficient But Not Greater Than Necessary To Achieve The Goals Of Sentence; A Below-Guidelines Sentence Is An Appropriate Sentence In This Case As To This Man

Section 3553(a)(3) directs a sentencing court to consider all of the sentences available in fashioning an individualized sentence in any given case.  In this case, a full range of sentences are available, ranging from a non-jail sentence (or time served) to any reasonable period of imprisonment.   Given these options, we submit that a sentence well below the Guidelines range is appropriate in this case.

### 1. The Goals Of Punishment As Set Forth In Section 3553(A) Do Not Require The Imposition Of A Guidelines Sentence

We respectfully submit that a Guidelines sentence is not necessary to meet the § 3553(a) goals of punishment, deterrence, protection of the public, rehabilitation and respect for the law.   Carl Kruger has fully accepted responsibility for his criminal conduct.  He has discussed his actions with his family, his religious leaders, and the members of his community.  It is clear to those who know him best that he understands just how badly he sinned. Carl does not seek to blame anyone else; he only wishes that his actions had not caused -- and do not threaten to further cause -- so much suffering for those he cares most for.

## 2. A Guidelines Sentence In This Case As To This Man Is Not Necessary To Promote Respect For The Law

While Mr. Kruger's criminal conduct did not evince a respect for the law, we submit that his genuine respect for the law is evidenced by his conduct throughout the rest of his life which, apart from the charged conduct, has been led in a wholly lawful manner. Such lawful and respectful conduct includes, but is not limited to, Mr. Kruger's emotionally charged plea of guilty.

Carl Kruger's guilty plea is one factor among many that demonstrates this defendant's true, deeply felt remorse and acceptance of responsibility for his conduct. In addition to the remorse described by Mr. Kruger and others to the Court, his conduct since his plea has demonstrated unwavering remorse and full acceptance of responsibility.

This Court will undoubtedly recognize the strong public policy that favors guilty pleas by defendants who bring their criminal cases to a rapid conclusion without requiring the expenditures of valuable Court resources. Counsel for Carl Kruger respectfully submits that, given the many factors described herein, a Guidelines sentence is not necessary to promote respect for the law. As the Supreme Court in *Gall* cautioned, in some instances, a sentence of imprisonment "may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 128 S.Ct. at 599 (citations omitted).

## 3. Just Punishment Does Not Require That Mr. Kruger Be Incarcerated For An Extensive Period Of Time

69

Carl Kruger recognizes the seriousness of his criminal conduct, and has taken responsibility for having engaged in that conduct.  He stands before this Court ashamed and remorseful.  In requesting a non-Guidelines sentence, Mr. Kruger does not seek to minimize the seriousness of his conduct.   However, a sentence well below the Guidelines range can still achieve the goal of "just punishment," even for a serious crime, while achieving § 3553(a)'s mandate that the punishment imposed should be "sufficient, but not greater than necessary" to accomplish the goals of sentencing.   18 U.S.C. § 3553(a)(2)(A)-(D).

The punishment that has already emerged from Mr. Kruger's looming separation from his family, the shame he feels even amongst his most vocal supporters, and the sobering resignation from his esteemed position as a New York State Senator are all significant.  He is now already living as a virtual prisoner, unable to help those in need who he has been there for time and time again, while watching from a great emotional distance as his family unravels under the stress of the uncertainty of their future together.

### 4. Lengthy Incarceration Would Be A Punishment Greater Than Necessary To Achieve The Goals Of Punishment, Rehabilitation, Deterrence And Protection Of The Public

Section 3553(a) contemplates that a punishment that is "sufficient but not greater than necessary" will achieve the goals of punishment, rehabilitation, deterrence and protection of public.  Punishment for criminal conduct can provide opportunities for a defendant's rehabilitation, where necessary, as well as specific and general deterrence and the protection of the public from future crimes a defendant may commit.  18 U.S.C. 3553(a)(2)(B) and (C).

Counsel for Mr. Kruger respectfully submits that a lengthy jail sentence for the purpose of achieving these goals is not necessary.   Moreover, a below-Guidelines sentence with post-release supervision that contains other punitive elements, including financial penalties[13], can also achieve the goals of specific and general deterrence.

In this case, any period of incarceration together with the collateral consequences of a felony conviction for someone in Carl Kruger's position would send the message to both Mr. Kruger and to other public officials that violating the law has serious consequences, more so for those entrusted with the power of representation.   This message has already been received by Mr. Kruger, who is now living with the terrible consequences of his criminal conduct for both himself and his family.

From a practical standpoint, after serving his sentence, Carl Kruger will never again be in a position to commit a similar crime.  He has lost everything that he worked a lifetime to build.  His reputation is destroyed and his family is teetering on disaster; no matter his sentence, he will never be elected to public office again.  His criminal acts, which required his position as a public official, simply can never be repeated.

Because a non-Guidelines sentence is reasonable and appropriate, we respectfully urge the Court to impose a short period of incarceration.

---

[13] The Government and Counsel for Carl Kruger have come to an agreement, pending the Court's approval, on forfeiture and restitution.   If accepted, the restitution obligations of Carl Kruger (and Michael Turano) will be satisfied in full at the time of sentencing.   Additionally, Carl Kruger has agreed to a forfeiture amount of approximately $365,000.

## VII.   CONCLUSION

For the reasons set forth herein, counsel respectfully submits that consistent with Section 3553(a), a below-guidelines sentence would be the sentence "sufficient, but not greater than necessary" to accomplish the traditional goals of sentencing.   *Kimbrough*, 128 S.Ct. at 570.

Respectfully,

Benjamin Brafman, Esq.
Joshua D. Kirshner, Esq.
Brafman & Associates, P.C.
*Attorneys for Carl Kruger*
767 Third Avenue, 26th Floor
New York, New York 10017
Tel (212)750-7800
Fax (212)750-3906
E-mail: Bbrafman@braflaw.com
jkirshner@braflaw.com